## MANUFACTURERS' ACCIDENT INDEMNITY CO. v. DORGAN.

(Circuit Court of Appeals, Sixth Circuit.    November 6, 1893.)

### No. 72.

1. OPINION EVIDENCE—INFERENCES.
   The opinion of a witness is not admissible where, by his detailing the facts to the jury, they can draw their own inferences therefrom.

2. SAME—EXPERT TESTIMONY.
   A physician may properly be asked as to his judgment of the conditions found in the body of one deceased, and what they indicated as to the cause of death.

3. APPEAL—OBJECTIONS WAIVED.
   Error in refusing to strike out plaintiff's evidence after he has rested is waived by the introduction of evidence by defendant.

4. OPINION EVIDENCE—EXPERT TESTIMONY.
   A physician, merely from hearing testimony as to an autopsy by those who performed it, cannot be asked whether the autopsy was such as to enable a physician to state the cause of death with any degree of certainty.

5. SAME.
   A physician who has made an autopsy may testify as to the necessity of making certain tests to ascertain the cause of death, where the sufficiency of the autopsy is questioned because of the failure to make such tests.

6. WITNESS—CORROBORATION.
   Testimony by a physician who made an autopsy that he examined the stomach of deceased for traces of alcohol may be corroborated by showing that it had been intimated to him that deceased had been drinking that day.

7. ACCIDENT INSURANCE—ACTIONS ON POLICIES—PROVINCE OF JURY.
   The issues in an action upon an accident insurance policy were whether the policy was void for breach of a warranty by the insured that he was not subject to bodily infirmity, and whether the manner and cause of death were within the policy. There was evidence that the insured had structural defect of the heart at the time of the issue of the policy, but the autopsy showed that, with the exception of a slight cold, his vital organs were in a normal condition; and one explanation of his death was consistent with the absence of disease as a moving or contributory cause, and brought the case within the terms of the policy. *Held,* that both issues were for the jury.

8. SAME—"BODILY OR MENTAL INFIRMITY."
   An anaemic murmur, indicating no structural defect of the heart, but arising simply from a temporary debility or weakened condition of the body, is not within the meaning of the term "bodily or mental infirmity," in an application for accident insurance, in which the applicant states his freedom from such infirmities.

9. SAME—"VOLUNTARY EXPOSURE TO UNNECESSARY DANGER AND HAZARDOUS OR PERILOUS ADVENTURE."
   "Voluntary exposure to unnecessary danger and hazardous or perilous adventure," in an accident insurance policy exempting the insurer from liability for death produced from such exposure, means wanton or grossly imprudent exposure.

10. APPEAL—HARMLESS ERROR.
    Failure of the charge to cover a hypothetical case which there is no evidence to support is not prejudicial.

11. ACCIDENT INSURANCE—ACCIDENTAL DROWNING.
    A drowning caused by a temporary trouble to which the insured was
    not subject, but which was entirely unusual and uncommon, whereby he
    fell into the water, is "accidental," within the meaning of an accident
    insurance policy.

12. SAME—PROXIMATE AND SOLE CAUSE OF DEATH.
    Under a provision of an accident insurance policy that the risk shall not
    extend "to any case except when the accidental injury shall be the
    proximate and sole cause of disability or death," if the insured suffer
    death by drowning, the drowning is the proximate and sole cause of death,
    no matter what the cause of falling in the water, unless death would have
    been the result without the presence of the water.

13. SAME—INDIRECT CAUSE OF DEATH.
    Under a provision of such a policy that the risk shall not be extended
    to "accidental injuries or death resulting from or caused, directly or in-
    directly," by fits, vertigo, or other disease, an accidental death by drowning
    results from and is caused indirectly by fits, vertigo, or other disease if the
    fall into the water from which drowning ensues is caused by such disease.

14. SAME—BODILY INFIRMITIES OR DISEASE.
    A provision in such a policy that the risk shall not extend to death
    caused by bodily infirmities or disease does not include fainting produced
    by indigestion or a lack of proper food, or any other cause which would
    show a mere temporary disturbance or enfeeblement.

In Error to the Circuit Court of the United States for the South-
ern Division of the Western District of Michigan.

At Law.   Action by Susan E. Dorgan against the Manufactur-
ers' Accident Indemnity Company on an accident insurance policy.
Verdict and judgment for plaintiff.   Defendant brings error.   Af-
firmed.

Statement by TAFT, Circuit Judge:

This was a writ of error brought to reverse a judgment of the United States
circuit court for the western district of Michigan, southern division, in favor
of Susan E. Dorgan, for $5,200, on an accident insurance policy or certificate
of membership issued by the defendant company upon the life of Thomas
Dorgan, husband of the plaintiff.   By the terms of the policy, $5,000 was
payable to Susan E. Dorgan, the plaintiff below, "within ninety days after re-
ceipt of satisfactory proof to this company of the death of the above-named
member, effected through external, violent, and accidental means, within the
extent and meaning of this contract and the condition hereunto annexed, and
such injuries alone shall have occasioned death within ninety days of the
happening thereof."

The evidence tended to show the following facts:
Early in May, 1890, Thomas Dorgan, the insured, left his home in Kala-
mazoo, Mich., with three or four companions, on a fishing excursion to a
place not many miles distant.   The party took with them wine, whisky, and
beer, and provisions.   They arrived at their destination in the afternoon,
made a camp near the brook in which they intended to fish, slept on cots
under a tent, and arose early the next morning, about 3 or 4 o'clock, to go
fishing.   They fished from that time until shortly before noon, when the mem-
bers of the party came into camp for lunch.   The weather was not very cold,
and there was some sunshine in the middle of the day.   Dorgan spoke of
having some difficulty with his throat and chest before going out on the
trip.   He took something for breakfast.   He came in to lunch.   The evidence
does not disclose how much he ate, if anything.   He went back to an island
in the brook, where, shortly afterwards, he was seen playing a trout.   Twenty
minutes later he was discovered lying in the brook, with his face downward,
and submerged in six inches of water, dead.   The bank was about eighteen
inches above the water, and there were in the water stones, egg-size and
smaller, upon which he might have struck his head.   There were two bruises

on his forehead. There was some little froth of a yellowish color about his mouth, and his face was purple. His tongue was somewhat inflamed. An autopsy was held on the evening of the day following the death. The blood in the corpse at the autopsy was rather fluid, and had not coagulated. The brain, the heart, and other vital organs were found in a normal and healthy condition. The autopsy was performed by one physician in the presence of two others. Evidence was introduced by the defendant tending to show that the deceased had suffered from defective action of the heart in its aortic valve. The autopsy failed to reveal any such structural defect, but all the tests were not applied. The evidence as to the defective action of the heart was given by the physician who had examined the deceased during his lifetime, and who testified to a murmur accompanying the beat of the heart, which was said to reveal such structural defect, though he admitted such a murmur is sometimes present when the action of the heart is normal, but the beat and circulation are feeble. There was also some evidence tending to show that the deceased had suffered from dizziness caused by this defective action of the heart.

Section 8 of the certificate of policy provided "that the benefits under this certificate shall not extend to hernia, orchitis, nor to bodily injury of which there shall be no external and visible mark upon the body of the member; nor shall they extend to or cover accidental injuries or death resulting from or caused, directly or indirectly, wholly or in part, by or in consequence of fits, vertigo, somnambulism, or any disease existing prior or subsequent to the date of this certificate, or by blood poisoning, or by coming in contact with any poisonous substance, or by poison in any form, or by inhalation or otherwise of any form of chloride gas, nitrous oxide gas, or any other form of gas or gases of chloroform or ether, or by or in consequence of any surgical operation or medical or mechanical treatment, or by lockjaw, nor to any cause excepting where the injury is the sole cause of the disability or death. No claim shall be made under this certificate * * * where the death or injury may have happened in consequence * * * of voluntary exposure to unnecessary danger, hazard, or perilous adventure, * * * or where death or injury may have happened while the member was, or in consequence of his having been, under the influence of intoxicating drinks. * * * And that these benefits shall not be held to extend to disappearances, nor to any cause of death or personal injury, unless the claimant under the certificate shall establish by direct and positive proof that the said death or personal injury was caused by external, violent, and accidental means, clearly within the intent and scope of this policy, and was not the result of design, either on the part of the member or any other person."

In the application which Dorgan made for membership in the company, (that is, for a policy,) he used this language: "Inclosing $5 for admission fee, I hereby apply for membership, to be based upon the following statement of facts, which I hereby warrant to be true. Certificate to be subject to all its conditions and provisions. * * * (13) I have never had, nor am subject to, fits, disorders of the brain, or any bodily or mental infirmity, except as herein stated. * * * (15) My habits of life are correct and temperate, and I understand that the certificate will not cover any accidental injury which may happen to me either while under the influence of intoxicating drinks, (or any other narcotics,) or in consequence of having been under the influence thereof. (16) I am aware that the insurance will not extend to hernia, orchitis, nor to any bodily injury of which there shall be no external and visible sign; nor to any bodily injury happening directly or indirectly in consequence of disease; nor to death or disability caused wholly or in part by bodily infirmities, or by disease, or by the taking of poison, or by any surgical operation or medical mechanical treatment; nor to any case except when the accidental injury shall be the proximate and sole cause of disability or death."

At the end of the application, Dorgan signed the following: "Declaration: I, Thomas Dorgan, being desirous of becoming a member of the Manufacturers' Accident Indemnity Company, do hereby warrant the above statements to be true; and I hereby agree that this declaration and warranty shall be the basis of the contract between me and the said company, and that

the certificate hereby applied for is accepted subject to all the conditions, classifications, and provisions contained or referred to therein."

The company pleaded the general issue, and gave notice of the intention to prove, under that issue, that Dorgan was, at the time he made the application for the policy, subject to fainting spells or fits, disorders of the brain, heart disease, disease of the throat and chest, and that the ·statement to the contrary in paragraph 13 of his application above was false and untrue, rendering the policy void. The defendant also gave notice of the intention to prove that Dorgan did not die in consequence of any bodily injury in which there was any external and visible sign, but he died in consequence of disease, and that his death was not caused by any accident or accidental injury which was the proximate and sole cause of his death.

The jury, under charge of the court, returned a general and special verdicts. The special verdicts were as follows: "First. Was Thomas Dorgan afflicted with heart disease at the time he made his application for the insurance policy issued by the defendant company, and at the time the policy in evidence in this suit was issued? Answer. No. Second. Was the · death of Thomas Dorgan occasioned solely by accident, or was it occasioned or contributed to by disease or undue and imprudent exposure? Answer. Solely accidental. Third. Was Thomas Dorgan conscious at the time his body entered the waters of Spring brook, where he was found dead? And, if unconscious, was such unconsciousness occasioned by disease or undue and imprudent exposure? Answer. First, unconscious; second, occasioned by some temporary affliction, without undue and imprudent exposure."

Osborn & Mills, for plaintiff in error.

Irish & Knappen, (E. M. Irish, of counsel,) for defendant in error.

Before JACKSON and TAFT, Circuit Judges, and BARR, District Judge.

TAFT, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

There are 25 assignments of error. Of these, 11 relate to rulings upon evidence. The court refused to permit defendant to ask this question of a witness who found the body of the deceased in the water: "If he had been standing, in your judgment would it have been possible for him to have fallen in the water in the position in which you found him?" We think the objection to this question was properly sustained. It asked for an opinion of the witness on facts which it was quite possible·for the witness to have detailed to the jury, so that the jury might have drawn its own inference. That there are cases where the judgment of a witness as to distance and other circumstances may be directly asked him is true, but such questions are not permissible when it is practicable to draw out with exactness the data upon which such judgment must be founded. Parker v. Steamboat Co., 109 Mass. 499. It must be left somewhat to the trial court, and in the exercise of its discretion upon this question we do not think the court erred. The same objection was properly sustained to the question: "Had Mr. Dorgan rolled from the position that he was found sitting in at the point of the island to the right in the stream, what would the position of his body have been with reference to the position it was in when you found it?" This was to ask the witness ·the question whether, in his opinion, Dorgan might have rolled from the place where he was sitting to the place where he was found, and called for an inference which it was proper that the jury alone should draw.

On the other hand, the following question was properly allowed to be put to the physician who performed the autopsy: "Supposing a person to have fallen and been stunned in shallow water, where he made very little struggle, state whether what you found to be the condition of the lungs would be what would be expected where a man came to his death in that manner." Answer: "I say, yes. It was precisely what we would have expected under all the circumstances. We all agreed to that." The witness was an expert, and it was proper to ask his judgment of the conditions which he found in the body of the deceased, and what they indicated as to the cause of death.

The fourth assignment of error was that the court erred in refusing to strike out the testimony of the plaintiff below when the plaintiff rested her case. This was equivalent to a motion to direct a verdict for the defendant on the plaintiff's evidence. It has been decided a number of times by the supreme court of the United States that if, after making such a motion, the defendant introduces evidence, he waives any error which the court may have made in not sustaining the motion. Insurance Co. v. Crandal, 120 U. S. 527, 7 Sup. Ct. 685; Railroad Co. v. Mares, 123 U. S. 710, 8 Sup. Ct. 321; Insurance Co. v. Smith, 124 U. S. 405, 8 Sup. Ct. 534.

The sixth and seventh assignments of error are based on the refusal of the court to permit questions which had been previously answered, and which were leading in form. We fully approve the action of the court in refusing to allow these questions to be put after a similar one had been once answered. The practice of counsel in repeating the question for the purpose of emphasizing the answer with the jury is not to be encouraged.

The eighth assignment of error is based on the action of the court in refusing to allow the following question: "You have heard the testimony in this case about the autopsy? Answer. I have. Question. In your judgment, from that testimony, doctor, would you say that the autopsy was such as to enable a physician to state with any degree of certainty the cause of the death of Mr. Dorgan?" This question was clearly incompetent, because it asked the witness, who was a physician, to make his own inference as to what the evidence of the other witness tended to show, and then, upon such inference, to give his opinion. To properly elicit his opinion as to the character of the autopsy, and its usefulness in showing the cause of the death, counsel should have stated the scope and character of the autopsy as he understood it, so that the jury, in weighing the answer of the witness, could know exactly upon what facts it was based. The difference between this question and the one put to the physician performing the autopsy is that here the witness was asked to weigh other men's evidence, a function peculiarly belonging to the jury, while there the witness was asked an expert opinion of bodily conditions which he saw with his own eyes. Had the physician whose judgment of the autopsy was asked been present at the autopsy, a question calling for his opinion as to its evidential weight in determining the cause of death would have been a proper one.

The ninth and tenth assignments of error are based on the ruling of the court allowing the physician who made the autopsy to answer the question whether there was any occasion for making what was called an air or water test with the heart of the deceased. He stated that there was no need of such a test. We think that this was competent, because the sufficiency of the autopsy to show the normal or abnormal condition of the heart had been questioned by evidence introduced for the defendant, and it was, of course, proper to show that the tests suggested by the defendant's witnesses were in this case not necessary.

The eleventh assignment of error was based upon the action of the court in sustaining the objection to this question put to the physician making the autopsy: "Had it been intimated to you in any way that Thomas Dorgan had been drinking that day?" Answer: "It had." The witness had stated previously that he had examined the stomach to see if there was any trace of alcohol in it. It was an issue of act as to whether he cut open the stomach or not. He said that he did, and, as a circumstance tending to corroborate him, it was here sought to show that his attention had been directed to the question whether Dorgan had been drinking that day. This question was clearly admissible and relevant. It was no more than to ask the witness what the purpose and scope of his investigation was.

The twelfth assignment of error was based on the refusal of the court to instruct the jury that on the undisputed evidence in the case the plaintiff was not entitled to recover. We are very clear that this request was rightly refused.

The defendant made two issues. The first issue was that the policy was void by reason of the alleged misrepresentation by the insured that he had not had, and was not subject to, fits, disorders of the brain, or any mental or bodily infirmity. The evidence of the autopsy at the time of his death was that his vital organs were in a normal condition, though he was suffering from a slight cold in the bronchial tubes. The evidence of two witnesses introduced by the defendant was that he had a structural defect of the heart which caused dizziness. The normal condition of the heart, as testified to by the physician performing the autopsy, tended to rebut this evidence, and the question of fact was for the jury, the burden being upon the company to show a breach of the warranty.

The second issue was as to whether the manner and cause of the death brought it within the policy. The burden of proof on this issue was upon the plaintiff. The deceased was found in the water, with his face in such a position that death might have come from suffocation by drowning, if he had been rendered unconscious before or after striking the water. There were bruises upon the forehead of the deceased, indicating that his head had struck something hard, and the bruises were of a character sufficient, as testified to by an expert witness, to have produced unconsciousness. The circumstances surrounding the death, therefore, were consistent with the theory that the deceased had slipped and fallen in such a way as to strike upon his head against

a hard substance, producing unconsciousness, in which helpless state suffocation by drowning followed.    This was one explanation of the death consistent with the absence of disease as a moving or contributing cause to the accident, and certainly brought the case within the terms of the policy.    Then there was another possible view which the jury in fact took, and which will be discussed hereafter.    Whether one or the other theory, or still another, satisfied the circumstances of the case, it was for the jury to decide.    The court had no right to usurp the functions of the jury in this respect.

The sixteenth assignment of error is based on the following charge to the jury:

"I have been requested by the plaintiff's counsel to instruct you something in regard to the inferences to be drawn from the condition of Dorgan at the time of this insurance, or about that time, as disclosed by the testimony about the condition of the heart, as is covered by the physicians, as giving out the alleged rattle or murmur.    Now, gentlemen, if the murmur or sound of disordered action which were indicated at or before the time when Dorgan made this application for insurance was simply an occasional consequence or mere debility,—an 'anaemic condition' they term it in scientific language, (which means the same thing, more or less;) no more or less than a debilitated, enfeebled condition, lacking of strength and vitality,—if that was the case, if what Dr. Pratt heard, and afterwards what Dr. Osborn heard, was simply an anaemic murmur, an occasional result only of a weakened and enfeebled condition of the body, that would not be such a disease or bodily infirmity as is warranted against.    This is but an amplification of what I have already explained to you, and is a mere continuation by parts of the general proposition which I have laid down to you, namely, that the defect or disease must be one of a definite and somewhat permanent character."

The charge was in relation to the warranty that the insured had never had, and was not subject to, fits, disorders of the brain, or any bodily and mental infirmity.

The court had charged the jury previously that it was not material whether the insured knew his actual condition or not at the time he made his application, if in fact his warranty was not true.    The court told the jury that in determining the question whether the insured was or not inflicted with any disease or bodily or mental infirmity they were to inquire whether he had some specific ailment; that it would not come within the scope of this warranty that he might, like other men or the generality of men, have been subject to occasional attacks of the kinds that are specified, "but there must have been some specific determination towards such condition of the body, or some part of it, as would amount to a disease or a bodily infirmity."

It seems to us that the court accurately stated the legal effect of the contract contained in the application and the policy.    An anaemic murmur, it was admitted, indicated no structural defect of the heart, but arose simply from mere temporary debility or weakened condition of the body.    We do not think that this comes within the definition of "bodily or mental infirmity," as the term is used in the application.    The statement in the application by the insured did not, either in his contemplation or that of the company, refer to any mere temporary ailment or indisposition which did not

tend to weaken and undermine the constitution at the time of taking membership. Pudritzky v. Supreme Lodge, 76 Mich. 428, 43 N. W. 373; Brown v. Insurance Co., 65 Mich. 306, 32 N. W. 610; Insurance Co. v. Daviess' Ex'x, 87 Ky. 541, 9 S. W. 812; Life Ins. Co. v. Francisco, 17 Wall. 672.

The seventeenth assignment of error is based on the following charge of the court:

"If the condition of Dorgan contributing to his death was produced by imprudent and wanton exposure of himself to the perils of the day,—the cold,— and such exposure was grossly imprudent, in consequence of any physical condition that he may have been in, then his death, if that imprudence contributed to his death, would not be within the scope of his policy or entitle a recovery."

This should be taken in connection with the part of the charge recited in the twenty-second assignment of error:

"It is not such exposure as men usually are going to take; such as is incident to the ordinary habits and customs of life. Such an exposure as that does not come within the range of a defense. An exposure, in order to have been a contributing cause, and so defeat the plaintiff's right to recovery in this case, must be something beyond the ordinary, or a wanton, a piece of gross, carelessness, as we would term such in our designation of a person's conduct in the usual walks of life. If Dorgan was at the time in an enfeebled physical condition, that circumstance may be taken into account in determining whether he was making an imprudent, wanton, and reckless exposure of himself,—of his life and health; but if the exposure to which he submitted himself was of a less degree than that, and such as I have described, then it is not within the terms of the policy."

We think the language of the court properly explained to the jury what was meant by the words "voluntary exposure, unnecessary danger, and hazardous adventure." It is questionable whether there was anything in the evidence requiring the plaintiff to exclude the possibility that death might have occurred by reason of exposure.

The eighteenth assignment of error was based on this charge of the court:

"If you are satisfied from the evidence that he was at the time intoxicated, so as not to be able to manage himself,—that is, not the result of simply taking a drink, one or more, perhaps, but if he was so intoxicated as that he was not fairly able to take care of himself prudently and properly,— and that contributed to the result, then such a result would not be within the scope of the policy."

It is objected to this charge that by the policy, if the death happened while the insured was under the influence of intoxicating drinks, no recovery could be had, even if such condition did not contribute to the result. It is not necessary for us to answer the question of construction thus suggested, because of the evidence as to intoxication. There was no evidence that the insured was intoxicated, except so far as two circumstances tended to show it. These were—First, the opportunity to drink afforded by the liquor which the fishing party brought with them; and, second, the circumstances of the death, which were of such a character that the result might have been contributed to by the intoxication of the deceased. Without this latter possibility there would have been

no evidence of any intoxication which the court could have submitted to the jury. Unless the intoxication did contribute to the death, therefore, no ground existed for saying that insured was intoxicated at all. Hence the plaintiff in error was not injured by the failure of the court to cover in his charge a hypothetical case which there was no evidence to support.

The twentieth and twenty-first assignments of error are based on exceptions taken to the following charge of the court:

"If you find that branch in favor of the plaintiff, you will then pass on to the second, and inquire whether or not this death resulted from some accident; simply as from, well, being in the brook, stumbling there and falling down, and becoming unconscious, and then drowning. Was that the fact, or was it, or might it with equal probability have been, the truth that from some condition that he was in, either one of considerable long continuance or short duration, it is no matter which, he fainted away, and fell into the brook? Whether he fell in before or after his death would be of no consequence. Inquire what was the fact in reference to that. You must be satisfied by a preponderance of the evidence, gentlemen, before you can render a verdict for the plaintiff in this case on that branch of the case; you must be satisfied that a preponderance of the evidence establishes the fact that the death was the result of an accident only, without the concurrence of any cause resulting from any disorder or disease or infirmity or deformity of Dorgan's vital organs."

We think this correctly stated the law of the case. The language expressly excepted to, namely, "Whether he fell in before or after his death would be of no consequence," had application to what the court stated immediately before, namely, that if his fainting away and falling into the brook had been the result of his bodily condition, whether of considerable long continuance or short duration, the death would not be within the policy, and that, no matter whether he fell in before or after his death, he could not recover. As the charge is printed, the sentence is separated from that to which it evidently belongs, and a different sense at first is given to it. We have no doubt that in the charge to the jury the sentence was put where it really belongs, as a mere qualification or explanation of the sentence immediately preceding.

The twenty-third assignment of error is based on the language of the court given to the jury in answer to the question put by them. The language was as follows:

"Gentlemen of the jury, I received a communication from your foreman that you wish instructions upon this question of whether deceased, when he was on the bank of the brook, was overtaken with some temporary trouble that caused him to fall in and was drowned, would that be considered only accidental? I instruct you, if he was at that moment overtaken with a trouble of which he was subject,—that is, from a recurrence of a trouble to which he was subject,—and he then fell in the brook and was drowned, that that would not be a case where a recovery could be had upon the policy, because his physical condition was a part of the causes contributing to the death; but if the temporary trouble spoken of in this question was one of which he was not subject, but was something entirely unusual and uncommon with him, and that he at that time fell into the brook and was drowned, that would be an accident, and the death would be accidental only."

The jury found that the insured was unconscious when he fell into the brook, and that the unconsciousness was due to a temporary affliction, in accordance with this charge.

The twenty-fifth assignment of error is based on the refusal of the court to vacate and set aside the verdict on the ground that the three special findings of the jury could not sustain their general verdict.

Upon these two assignments of error arises the main, difficult, and doubtful question in the case. The policy provided, as we have already seen, that the benefits under it extended to the death of the insured through external, violent, and accidental means, and that it should not cover accidental injuries or death resulting from or caused, directly or indirectly, wholly or in part, by or in consequence of fits, vertigo, somnambulism, or any disease existing prior or subsequent to the date of the certificate, or to any cause excepting where the injury was the sole cause of the disability or death. In the application the deceased stated that he was aware that the insurance would not extend to "any bodily injury happening, directly or indirectly, in consequence of disease, or to death or disability caused wholly or in part by bodily infirmities or disease, or to any case where the accidental injury was not the proximate and sole cause of disability or death.".

It is well settled that an involuntary death by drowning is a death by external, violent, and accidental means. Trew v. Assurance Co., 6 Hurl. & N. 838; Winspear v. Insurance Co., 6 Q. B. Div. 42; Reynolds v. Insurance Co., 22 Law T. (N. S.) 820.

We are of the opinion that in the legal sense, and within the meaning of the last clause, if the deceased suffered death by drowning, no matter what was the cause of his falling into the water, whether disease or a slipping, the drowning, in such case, would be the proximate and sole cause of the disability or death, unless it appeared that death would have been the result, even had there been no water at hand to fall into. The disease would be but the condition; the drowning would be the moving, sole, and proximate cause.

In Winspear v. Insurance Co., 6 Q. B. Div. 42, the terms of the policy provided "that it should cover any personal injury caused by accidental, external, and visible means, if the direct effect of such injury should occasion his death; and it provided, further, that it should not extend to any injury caused by or arising from natural disease or weakness, or exhaustion consequent upon disease." The insured was seized with an epileptic fit and fell into a stream, and was there drowned while suffering from a fit. It was held that the death was within the risk covered by the policy, and that the proviso did not apply.

In Lawrence v. Insurance Co., 7 Q. B. Div. 216, the policy provided:

"This policy covers injuries accidentally occurring from material and external cause operating upon the person of the insured, where such accidental injury is the direct and sole cause of the death to the insured, but it does not insure in case of death arising from fits, * * * or any disease whatsoever, arising before or at the time or following such accidental injury, whether consequent upon such accidental injury or not, and whether causing such death directly, or jointly with such accidental injury."

The insured, while at a railway station, was seized with a fit, and fell forward off the platform across the railway, when an en-

gine and carriages which were passing went over his body, and killed him. It was held that "the death of the insured was caused by an accident, within the meaning of the policy, and that the insurers were liable."

Mr. Justice Watkin Williams said in this case:

"The true meaning of this proviso is that, if the death arose from a fit, the company are not liable, even though accidental injury contributed to the death in the sense that they were both causes, which operated jointly in causing it. That is the meaning, in my opinion, of this proviso. But it is essential to that construction that it should be made out that the fit was a cause, in the sense of being the proximate and immediate cause of the death, before the company are exonerated, and it is not the less so because you can show that another cause intervened and assisted in the causation."

After giving some illustrations, the learned justice continued:

"I therefore put my decision on the broad ground that, according to the true construction of this policy and this proviso, this was not an act arising from a fit, and therefore whether it contributed directly or indirectly, or by any other mode, to the happening of the subsequent accident, seems to me wholly immaterial, and the judgment of the court ought to be in favor of the plaintiff."

These cases are referred to with approval by Mr. Justice Gray in delivering the opinion of the supreme court in case of Insurance Co. v. Crandal, 120 U. S. 527–532, 7 Sup. Ct. 685. They sufficiently establish the proposition that, if the deceased in this case died by drowning, then drowning was in law the sole and proximate cause of the disability of death.

We now proceed to inquire whether, if the fall of the deceased into the water was caused by fits, vertigo, or any disease, such accidental death could be said, within the meaning of the policy, to have been "caused directly or indirectly, wholly or in part, by or in consequence of such fits, vertigo, or disease." In our opinion the adjective "accidental" qualifies not only "injuries," but also "death," and therefore an accidental death by drowning does result from, and is caused indirectly by, fits, vertigo, or other disease, if the fall into the water, from which drowning ensues, is caused by such disease. The exception is broader than the exceptions in the policies considered in the Winspear and the Lawrence Cases, and is made so by the use of the word "indirectly." As can be seen from the words of Mr. Justice Williams quoted above in the Lawrence Case, if that policy had provided that it should not apply to an accident to which a fit contributed indirectly, the company would not, in his opinion, have been liable.

We are therefore finally brought to the question what the words "disease and bodily infirmity" include. We think the charge of the court below upon this point must be sustained. In a broad, generic sense, any temporary trouble by reason of which a man loses consciousness is a disease. It is a condition of the body not normal, and produced by the imperfect working of some function, but as the imperfect working is not permanent, and the body returns at once, or in a short period of time, to its normal condition, it does not rise to the dignity of a disease. A fainting spell produced by indigestion or a lack of proper food for a number of

hours, or from any other cause which would not indicate any disease in the body, but would show a mere temporary disturbance or enfeeblement, would not come within the meaning of the words "disease and bodily infirmity," as used in this policy.

It is a well-settled rule in the construction of insurance policies of this character, which the insured accepts for the purpose of covering all accidents, to construe all language used to limit the liability of the company, strongly against the company. Policies are drawn by the legal advisers of the company, who study with care the decisions of the courts, and, with those in mind, attempt to limit as narrowly as possible the scope of the insurance. It is only a fair rule, therefore, which courts have adopted, to resolve any doubt or ambiguity in favor of the insured and against the insurer. Fitton v. Insurance Co., 17 C. B. (N. S.) 122; Insurance Co. v. Crandal, 120 U. S. 527–533, 7 Sup. Ct. 685; Association v. Newman, 84 Va. 52, 3 S. E. 805; Healey v. Association, 133 Ill. 556, 25 N. E. 52. Our view of what the word "disease" must be limited to in this policy is sustained by the decisions of the supreme court of Michigan in Pudritzky v. Supreme Lodge, 76 Mich. 428, 43 N. W. 373, and Brown v. Insurance Co., 65 Mich. 306, 32 N. W. 610, and also by Insurance Co. v. Daviess' Ex'x, 87 Ky. 541, 9 S. W. 812.

In Life Ins. Co. v. Francisco, 17 Wall. 672, a physician testified that the person, who had died 24 days after the policy issued, had the disease of indigestion, torpid liver, and colic, and that he died from acute hepatitis; whereas several acquaintances of the deceased testified that they had never known him to be unwell, or if so more than very slightly, and that they considered him to be a healthy man. The defense of the insurance company was that the decedent had answered, in reply to the usual questions, that he had no sickness or disease. In reference to this issue the court instructed the jury that it was for them to determine from the evidence whether the person whose life was insured had, during the time mentioned in the questions propounded on making the application, any affliction that could properly be called a "sickness or disease," within the meaning of the term as used, and said:

"For example, a man might have a slight cold in the head or slight headache, that in no way seriously affected his health, an affliction which might be forgotten in a week or a month, which might be of so trifling a character as not to constitute a 'sickness or disease,' within the meaning of the term as used, and which the party would not be required to mention in answering questions."

This charge was held good.

The point made under the twenty-fifth assignment of error is that there was no evidence to sustain the finding of the jury that the unconsciousness of the deceased, during which drowning ensued, was caused by a temporary affliction. There certainly was no direct evidence of this cause. No one was present to see how the death in fact did occur. The conclusion of the jury in any case must be based upon inference from circumstances, and not from direct evidence. There was the circumstance that the deceased was found dead, with his face submerged in water, in such a position that

drowning might have caused his death. There was the expert evidence of the physician who performed the autopsy to the effect that the condition of the body of the deceased after death indicated death by drowning, and was what might be expected if the deceased had been drowned. There was the evidence of the same physician that the vital organs of the deceased were normal, and indicated the presence of no disease. Assuming these facts proven, (and, there having been evidence to prove them, the jury had a right to conclude that they were facts,) it would be a very reasonable inference that a man would not drown in water only six and a half inches deep unless he were unconscious as he lay in the water. Something must have produced the unconsciousness. It was not produced by disease, because the autopsy tended to show that the deceased was not suffering from disease likely to cause unconsciousness, and the jury might well have inferred that the bruises upon the head did not indicate a sufficient concussion to produce unconsciousness. Reasoning by exclusion, therefore, the jury might from the circumstances properly have found the verdict which they did find, namely, that the unconscious and helpless condition of the insured in which drowning ensued arose, not from disease, but from indigestion or want of food, or some other temporary cause.

The judgment of the court below is affirmed, with costs.