## KING v. ORDER OF UNITED COMMERCIAL TRAVELERS OF AMERICA.
### Civil Action No. 471.

District Court, W. D. South Carolina, Spartanburg Division.

May 24, 1946.

Johnson, Johnson & Foster, of Spartanburg, S. C., and Jesse W. Boyd, of Spartanburg, S. C., for plaintiff.

Haynsworth & Haynsworth, of Greenville, S. C., and Rainey and Fant, of Greenville, S. C., for defendant.

WYCHE, District Judge.

The defendant in this action is a fraternal benefit association. The plaintiff, as beneficiary of a certificate of membership insurance, issued by the defendant on the life of her husband, Drew L. King, seeks to recover the sum of Five Thousand Dollars ($5,000), from the defendant upon its insurance contract, which provided that it would pay to the beneficiary the sum of Five Thousand Dollars ($5,000), upon receipt of due proof of the death of the insured effected solely through external, violent and accidental means.

The facts have been stipulated by the parties, and are as follows:

"1. * * *

"2. Plaintiff is a resident of Spartanburg, South Carolina.

"3. The defendant is a Fraternal Benefit Association organized and maintained for the purpose, among other things, to 'establish funds to indemnify its members for disability or death resulting from accidental means'; incorporated under the laws of the State of Ohio, and licensed to do business as a fraternal benefit association in the State of South Carolina.

"4. On September 20, 1938, the defendant issued the deceased Drew Lagrone King, Certificate No. 276431–R hereto attached as Exhibit 'A' thereby certifying that he had been accepted as an insured member of said Order under Class 'A.' Said Certificate further provided that it, together with the application for insurance, constitution and by-laws and certain other papers not involved in this litigation, should constitute the contract between the parties. This contract was in force on February 9, 1943. The papers and documents referred to in this paragraph may be handed to the Court by either party during the course of the trial.

"5. The portions of the defendant's constitution and by-laws relevant to this action are:

"(a) Article 15, Section 13, providing the indemnity of $5,000.00 in the event of death effected solely through external, violent and accidental means.

"It is conceded that the deceased elected Option 2 with reference to the mode of settlement providing that the entire indemnity should be paid within ninety days from the receipt by the Supreme Executive Committee of satisfactory final proof of death. The plaintiff herein was the duly designated beneficiary, and if entitled to recover against the defendant, the amount of such recovery should be $5,000.00, with interest at six per cent. (6%) from the twenty-fifth day of August, 1943, and costs.

"(b) Article 15, Section 16, which provides 'this Order shall not be liable to any person for any benefit for death resulting from participation, as a passenger or otherwise, in aviation or aeronautics (except as a fare-paying passenger in a licensed aircraft operated on a regular schedule ——).

"6. On February 9, 1943, the deceased, a Second Lieutenant in the Civil Air Patrol with Coastal Patrol No. 8, was stationed at James Island near Charleston, South Carolina. On the morning of February 9, 1943, at around 8 A. M. he left his base field as an observer in a land based plane piloted by a First Lieutenant, Clarence Rawls, on a routine coastal patrol flight. Included in the patrol was a second plane piloted by Lieutenant James A. Taylor with Lieutenant K. C. Bates as Observer. All of the above parties were members of the Civil Air Patrol.

"About 9:30 A. M. the plane occupied by Rawls and King developed motor trouble and was forced down on the Atlantic Ocean at about thirty miles out from Cape Fear, North Carolina.

"At around 9:33 A. M. Taylor and Bates observed the plane on the water, where it had apparently landed in a normal landing attitude. Both Rawls and King were out of the plane and in the water wearing inflated life jackets and neither seemed to Taylor or Bates to have been injured from the landing. Taylor and Bates circled them at an altitude of about fifty feet and could see both men signalling with their arms. They dropped them emergency kits containing whiskey and concentrates and radioed their situation and position to the base. The plane sank within about four minutes after being first observed on the water. Taylor and Bates went up to an altitude of about 500 to 600 feet so that they could keep King and Rawls in sight and continued to circle them for a period of two to two and one-half hours when a shortage of gasoline forced them to head for their base. During this period King was alive.

"The two men were picked up by a Navy boat about 2 P. M. both being dead at the time. The bodies were examined by Lieutenant Com. Landis C. Brown (a duly licensed and practicing physician in civil life) of the United States Navy at the Sec-

tion Base Hospital of Fort Caswell at Southport, North Carolina. He found one or two slight scratches on Lieutenant King's body but found no marks severe enough to be called an injury or considered a contributory cause of death. His diagnosis as shown in the proof of death furnished by plaintiff to defendant, was 'Drowning as a result of exposure in the water after failure of airplane motor.' Lt. Com. Brown was not an eye witness to events leading to the death of King.

"7. Final proofs of death were duly submitted to the defendant on May 25, 1943.

"8. *The single issue presented by this case is whether or not the deceased's death fell within the exemption provided in the contract of insurance which reads as follows: 'This Order shall not be liable to any person for any benefit for death resulting from participation, as a passenger or otherwise, in aviation or aeronautics,* (except as a fare-paying passenger in a licensed aircraft operated on a regular schedule),' it being conceded that in making the trip from the base field at James Island on February 9, 1943, he was not a fare-paying passenger on a licensed aircraft operated on a regular schedule."

The application for membership in, and to be insured by, the defendant insurance company, together with a deposit of the requisite fee and premium therefor, was made by Drew L. King in this State to Spartan Council, No. 323 of Spartanburg, South Carolina, upon which application the defendant delivered to him its insurance certificate at Spartanburg, South Carolina.

■ Under such facts, (as well as under State statutes[1]), the insurance certificate involved in this controversy is a South Carolina contract, governed and solvable by the laws of this State. Owen v. Banker's Life Insurance Co., 84 S.C. 253, 256, 66 S.E. 290, 137 Am.St.Rep. 845; Cantey, Adm'r v. Philadelphia Life Ins. Co., 166 S.C. 181, 188, 164 S.E. 609; Fountain & Herrington v. Mutual Life Ins. Co., 4 Cir., 55 F.2d 120.

■ It has been decided in South Carolina, that cause of death, within the meaning of insurance against death resulting from external, violent and accidental means, is the immediate cause, and not the remote cause. Goethe v. New York Life Ins. Co., 183 S.C. 199, 190 S.E. 451, 458. In that case, Goethe died of a heatstroke, following vigorous efforts to put out a fire. On

1 "Condition precedent to doing business in this state.—It shall be a further condition precedent to the right of any such corporation to do business in this State, that it shall be taken and deemed to be the fact irrebuttable, and part and parcel of all contracts entered into between such corporation and a citizen or corporation of this State, that the taking or receiving, from any citizen or corporation of this State, of any charge, fee, payment, toll, impost, premium or other moneyed or valuable consideration, under or in performance of any such contract, or of any condition of the same, shall constitute the doing of its corporate business within this State, and that the place of the making and of performance of such contract shall be deemed and held to be within this State, anything contained in such contract or any rules or by-laws of such corporation to the contrary notwithstanding." Code of Laws of South Carolina, 1942, § 7773.

"Corporations doing business in this state deemed doing business under this chapter.—All such corporations hereafter doing business in this State, as defined in this chapter, shall be deemed and held to be doing such business under and in pur-

suance of the terms and conditions of this chapter, and that such terms and conditions shall be deemed and taken in all the courts of this State to be a part and parcel of all contracts hereafter entered into between such corporations and a citizen or corporation of this State, anything contained in any such contract or in any rules or by-laws of such corporation to the contrary notwithstanding." Code of Laws of South Carolina, 1942, § 7774.

"Subject to laws—limitations.—All and every such foreign corporation carrying on business or owning property in this State shall be subject to the laws of the same in like manner as corporations chartered under the laws of this State, but nothing herein contained shall be construed to permit any such foreign corporation to exercise any franchise or enjoy any privilege or immunity other than the right to own property and carry on business in like manner as individuals, natural born citizens of such State of the United States or of foreign countries, might do, and subject to the terms and conditions of this chapter." Code of Laws of South Carolina, 1942, § 7776.

the issue of whether death was the culmination of angina pectoris, a disease, or heatstroke, an accident, the Supreme Court of South Carolina said: "In our opinion, the heatstroke suffered by the insured in the case at bar was in and of itself an accidental means, * * *."

The South Carolina Supreme Court has also adopted the rule, as to exclusion clauses in accident insurance policies, that liability is to be determined by the cause of death, and not by circumstances or status of the insured. Young v. Life & Casualty Insurance Co., 204 S.C. 386, 29 S.E. 2d 482, 483. In sustaining recovery for death of a soldier in an automobile accident while on furlough, even though the exclusion clause of the policy excluded liability " * * * if death results from bodily injuries sustained while participating in aviation or aeronautics as a passenger or otherwise, or *while* the insured is in military or naval service in time of war" (emphasis added), the Court in this case said: "We have denied the status theory in previous cases involving insurance clauses. In McGee v. Globe Indemnity Co., 173 S.C. 380, 175 S.E. 849, 850, it was held that a provision in a policy indemnifying the owner of an automobile against loss or damage to his car, which should not apply while the car was used by any person in violation of law as to age, or by any person under the age of 16 years, did not relieve the insurer of liability for an accident, although the operator of the car at the time was under 16 years of age. The Court held that in addition it must be shown that a causal connection existed between the age of the driver and the accident. In the McGee case, supra, the insurer specifically raised the question of status or condition. The Court stated with reference to this contention: 'We are of the opinion that the distinction advanced between the excluded act and condition is without any logical basis. * * * The rule established by the Reynolds case (Reynolds v. Life &

Casualty Ins. Co., 166 S.C. 214, 164 S.E. 602), is obviously founded upon the reasonable view that, when the parties made the contract of insurance, they were not inserting a mere arbitrary provision, but that it was the purpose of the insurance company to relieve itself of liability from accidents caused by the excluded condition.' " [2] See also, Bailey v. United States Fidelity & Guaranty Co., 185 S.C. 169, 171, 193 S.E. 638.

In the construction of insurance contracts, it must be remembered that the courts should not ignore the fact that the primary object of all insurance is to insure, and that, in cases of doubt, uncertainty, manifest ambiguity, or susceptibility of two equally reasonable interpretations, since the language used is the selection and arrangement of the insurer, such contracts must be liberally construed in favor of the insured. Parker v. Jefferson Standard Life Ins. Co., 158 S.C. 394, 397, 155 S.E. 617. Insurance policies are drawn by the legal advisers of the insurance company, who study with care the decisions of the courts, and, with such decisions in mind, attempt to limit as narrowly as possible the scope of the insurance. It is only a fair rule, therefore, which courts have adopted, to resolve any doubt or ambiguity in favor of the insured and against the insurance company. Manufacturers' Accident Indemnity Co. v. Dorgan, 6 Cir., 58 F. 945, 956, 22 L.R.A. 620.

While, as stated before, I must be guided, in construing the insurance contract, by the law of South Carolina, I think it should be observed that the rules of construction of accident insurance policies, the principles of law declared, and the conclusions reached by the South Carolina Supreme Court in the foregoing decisions of Goethe v. New York Life Ins. Co., supra; Young v. Life & Casualty Insurance Co., supra; McGee v. Globe Indemnity Co., supra; Reynolds v. Life & Casualty Ins. Co., supra; Bailey v. United States Fidelity &

---

[2] It is true that the Circuit Court of Appeals for the Fourth Circuit in the case of Myers v. Ocean Accident & Guarantee Corporation, 99 F.2d 485, observed that the weight of authority was against the principle laid down in this case, but in that case the court was not governed by the South Carolina decisions. Here, I must be governed by the South Carolina law, as declared by the South Carolina Supreme Court in construing the insurance contract.

Guaranty Co., supra; Parker v. Jefferson Standard Life Ins. Co., supra, find respectable and weighty support in the clear reasoning of Circuit Judge Taft, later Chief Justice of the Supreme Court, in the decision of the Circuit Court of Appeals of the Sixth Circuit in the case of Manufacturers' Accident Indemnity Co. v. Dorgan, supra, and in the logic of the opinion of Circuit Judge Minton in the decision of the Circuit Court of Appeals of the Seventh Circuit in the case of Bull v. Sun Life Assurance Co., 141 F.2d 456, 155 A.L.R. 1014, certiorari denied 323 U.S. 723, 65 S.Ct. 55, 89 L.Ed. 581, as well as, in Lord Bacon's maxim, quoted with approval by the Tenth Circuit Court of Appeals in the case of Ætna Life Ins. Co., Hartford, Conn. v. Conway, 102 F.2d 743.[3]

In the Dorgan Case [6 Cir. 58 F. 954], the deceased (husband of the plaintiff in that case) was last seen alive fishing in a brook. Twenty minutes later, he was discovered lying in the brook, with his face downward, and submerged in six inches of water, dead. The defendant insurance company contended, and evidence was introduced by it, tending to show that the deceased had suffered from defective action of the heart in its aortic valve. The jury found adversely to defendant's contention, and rendered a verdict for the plaintiff. In affirming the judgment of the district court, Judge Taft said:

"The policy provided, as we have already seen, that the benefits under it extended to the death of the insured through external, violent, and accidental means, and that it should not cover accidental injuries or death resulting from or caused, directly or indirectly, wholly or in part, by or in consequence of fits, vertigo, somnambulism, or any disease existing prior or subsequent to the date of the certificate, or to any cause excepting where the injury was the sole cause of the disability or death. In the application the deceased stated that he

was aware that the insurance would not extend to 'any bodily injury happening directly or indirectly, in consequence of disease, or to death or disability caused wholly or in part by bodily infirmities or disease, or to any case where the accidental injury was not the proximate and sole cause of disability or death.'

"It is well settled that an involuntary death by drowning is a death by external, violent, and accidental means. Trew v. Assurance Company, 6 Hurl. & N. 838; Winspear v. Insurance Co., 6 Q.B.Div. 42; Reynolds v. Insurance Co., 22 Law T. (N.S.) 820.

"We are of the opinion that in the legal sense, and within the meaning of the last clause, *if the deceased suffered death by drowning, no matter what was the cause of his falling into the water, whether disease or a slipping, the drowning, in such case, would be the proximate and sole cause of the disability or death, unless it appeared that death would have been the result, even had there been no water at hand to fall into.* The disease would be but the condition; the drowning would be the moving, sole, and proximate cause.

"In Winspear v. Insurance Co., 6 Q.B. Div. 42, the terms of the policy provided 'that it should cover any personal injury caused by accidental, external, and visible means, if the direct effect of such injury should occasion his death; and it provided, further, that it should not extend to any injury caused by or arising from natural disease or weakness, or exhaustion consequent upon disease.' The insured was seized with an epileptic fit and fell into a stream, and was there drowned while suffering from a fit. It was held that the death was within the risk covered by the policy, and that the proviso did not apply.

In Lawrence v. Insurance Co., 7 Q.B. Div. 216, the policy provided:

" 'This policy covers injuries accidentally occurring from material and external cause

---

[3] The defendant relies upon the cases of Neel v. Mutual Life Ins. Co. of New York, 2 Cir., 131 F.2d 159, and Green v. Mutual Ben. Life Ins. Co., 1 Cir., 144 F. 2d 55, but the opinions in these cases are not in conformity with the decisions of the South Carolina Supreme Court, and are contrary to the reasoning of the court in the Dorgan and Bull Cases. Furthermore, the facts in these cases, relied upon by the defendant, are distinguishable from the facts in the case now under consideration.

operating upon the person of the insured, where such accidental injury is the direct and sole cause of the death to the insured, but it does not insure in case of death arising from fits, * * * or any disease whatsoever, arising before or at the time or following such accidental injury, whether consequent upon such accidental injury or not, and whether causing such death directly, or jointly with such accidental injury.'

"The insured, while at a railway station, was seized with a fit, and fell forward off the platform across the railway, when an engine and carriages which were passing went over his body, and killed him. It was held that 'the death of the insured was caused by an accident, within the meaning of the policy, and that the insurers were liable.'

"Mr. Justice Watkin Williams said in this case: 'The true meaning of this proviso is that, if the death arose from a fit, the company are not liable, even though accidental injury contributed to the death in the sense that they were both causes, which operated jointly in causing it. That is the meaning, in my opinion, of this proviso. But it is essential to that construction that it should be made out that the fit was a cause, in the sense of being the proximate and immediate cause of the death, before the company are exonerated, and it is not the less so because you can show that another cause intervened and assisted in the causation.'

"After giving some illustrations, the learned justice continued: 'I therefore put my decision on the broad ground that, according to the true construction of this policy and this proviso, this was not an act arising from a fit, and therefore whether it contributed directly or indirectly, or by any other mode, to the happening of the subsequent accident, seems to be wholly immaterial, and the judgment of the court ought to be in favor of the plaintiff.'

"These cases are referred to with approval by Mr. Justice Gray in delivering the opinion of the supreme court in case of Accident Insurance Co. v. Crandal, 120 U.S. 527–532, 7 S.Ct. 685 [30 L.Ed. 740]. They sufficiently establish the proposition that, if the deceased in this case died by drowning, then drowning was in law the sole and proximate cause of the disability of death.

"We now proceed to inquire whether, if the fall of the deceased into the water was caused by fits, vertigo, or any disease, such accidental death could be said, within the meaning of the policy, to have been 'caused directly or indirectly, wholly or in part, by or in consequence of such fits, vertigo, or disease.' In our opinion the adjective 'accidental' qualifies not only 'injuries,' but also 'death,' and therefore an accidental death by drowning does result from, and is caused indirectly by, fits, vertigo, or other disease, if the fall into the water, from which drowning ensues, is caused by such disease. The exception is broader than the exceptions in the policies considered in the Winspear and the Lawrence cases, and is made so by the use of the word 'indirectly.' As can be seen from the words of Mr. Justice Williams quoted above in the Lawrence case, if that policy had provided that it should not apply to an accident to which a fit contributed indirectly, the company would not, in his opinion, have been liable." (Emphasis added)

In the recent case of Bull v. Sun Life Assur. Co., supra [141 F.2d 457], there was for construction by the Court an exclusion clause, more favorable to the insurer than is the exclusion clause in the case here under consideration. The exclusion clause in the Bull Case was, "Death as a result, directly or *indirectly*, of service, travel, or flight in any species of aircraft, as a passenger or otherwise, is a risk not assumed under this policy." (Emphasis added)

The facts in the Bull Case disclose that:

"On February 5, 1942, Richard Bull, who was then a Lieutenant (j. g.) in the United States Naval Reserve, was commanding officer and alternate pilot of a seaplane which was engaging in routine patrol duty in the South Pacific. Coming across some Japanese ships at anchor in a small harbor, Lieutenant Bull and his crew commenced bombing them, but anti-aircraft fire and Japanese Zeros peppered their

plane. The port motor was shot out, gasoline poured into the hull, filling the plane with fumes, and ten or fifteen miles from the scene of the encounter they were forced to make a landing on the water, 500 to 1,000 yards off the island of Amboina, Dutch East Indies. The plane did not crash, but after landing it could not have flown again without repairs. The motors were immediately cut off and for ten minutes the plane was afloat with its anchor overboard. Gasoline was still escaping from the gas tanks into the hull of the plane and spreading upon the surrounding water so that the whole area was in an explosive condition.

"Two of the plane's crew, Hargrave and Nelson, with a wounded comrade, debarked from the plane in a rubber boat. Hargrave testified by deposition that Lieutenant Bull was inside the plane the last time that he saw him. Nelson testified by deposition that the last time he saw him, he was outside the plane on the fuselage, trying to launch a rubber boat. While Lieutenant Bull was in that position, attempting to escape from the immobile, disabled plane, a Japanese seaplane dived to within thirty to fifty feet of the crippled plane, strafing it and the water around it. According to Nelson, Lieutenant Bull was exposed to this machine gun fire. To protect themselves, Nelson and Hargrave abandoned their life raft and dived into the water. The first strafing not having sunk the disabled plane, the enemy plane circled and returned for a second attack. While the witnesses were under the water, they heard an explosion, and when they emerged, the area where the plane had been was in flames, with only the tip of a wing still visible. Lieutenant Bull was never seen thereafter. Whether he was on the fuselage at the time of the second strafing does not appear."

Among other things, Judge Minton, in his opinion affirming the judgment for the insured, said:

"The question presented to us is whether Lieutenant Bull met his death 'as a result, directly or indirectly, of service, travel, or flight' in that seaplane. This is a legal question that requires us to construe the contract of insurance. It is elementary that such contracts are strictly construed against the insurance company. Unless the clear and reasonable construction of this contract supports the contention of the defendant, we must affirm the District Court. * * *

"It is the defendant's contention that Lieutenant Bull's death was the indirect result of service, travel, or flight in that patrolling seaplane. Let us consider the case from this view. The seaplane had landed and was so disabled that it would never fly again without repairs. It was anchored, and the engines had been stopped for nearly ten minutes. Service, travel, and flight in that plane had come to an end. Lieutenant Bull, as the evidence showed, was out upon the fuselage trying to inflate a rubber boat for the purpose of escape. While he was in that position, the jury had a right to infer, a Japanese plane shot him and from those bullet wounds he died. Was his death a result of aviation or of war? What connection, direct or indirect, did his death have with that disabled aircraft which lay in the water, useful only as a raft? *The sole connection was that Lieutenant Bull arrived at this place by way of aircraft. But he was not injured in the arrival. He was not injured by service, travel, or flight in the aircraft. He was killed after those things had terminated.*

\* \* \* \* \* \*

"We hold that disengagement from service, travel, and flight in that seaplane had taken place in the case at bar, and that Lieutenant Bull's death had no connection, directly or indirectly, with service, travel, or flight in that seaplane within the meaning of the policy. Where the service, travel, and flight in the aircraft had definitely ended, and the only connection the insured had with the plane at the time he met his death at the hands of a strafing Jap was that he had arrived by plane at the place where the Jap shot him, his death was too remote to be considered the result, direct or indirect, of service, travel, or flight in an aircraft. * * *" (Emphasis added)

The Circuit Court of Appeals of the Tenth Circuit in the case of Ætna Life Ins. Co., Hartford, Conn. v. Conway, 102 F.2d 743, 744, quotes with approval the

following from the decision in the case of Meyer v. Fidelity & Casualty Co. of New York, 96 Iowa 378, 65 N.W. 328, 330, 59 Am.St.Rep. 374: "It seems to be a well-settled rule in insurance law to attribute an injury or loss to its proximate cause only; and, if this be true, the disorder, whatever it may have been, was but a condition, the fall being the sole and proximate cause of the injury. Lord Bacon's maxim that 'it were infinite for the law to judge the cause of causes, and their impulsions one of another; therefore it contenteth itself with the immediate cause, and judgeth of acts by that, without looking to any farther degree,'—seems to apply to this character of cases." Citing Manufacturers' Accident Indemnity Co. v. Dorgan, 6 Cir., 58 F. 945, 22 L.R.A. 620.

In the instant case, Lieutenant King arrived by way of aircraft at the place near where he was later accidentally drowned, but he was not injured in the arrival or in leaving the plane which had brought him there. He left the plane uninjured and wearing an inflated life jacket. The plane had not crashed, but had landed on the water in a normal landing attitude and sank within a few minutes after its landing. Service, travel, flight and participation in aviation or aeronautics in that plane had come to an end without injury to Lieutenant King. At the time the plane sank, King was alive and uninjured and had the protection of an inflated life jacket which he was wearing. He was known to have been alive for a period of, at least, two to two and one-half hours thereafter. Lieutenant Taylor, piloting another plane, had kept King in sight for two or two and one-half hours, when a shortage of gasoline in his plane forced him to return to his base.

To bar recovery by the plaintiff in this case, it would be necessary to write some other wording into the exclusion clause involved, which was not written there by the defendant insurance company when its policy was issued to Lieutenant King. I find that disengagement from participation in aviation or aeronautics had taken place, and under the facts, and applicable law in this case, it cannot be said that Lieutenant King's death resulted from participation, as a passenger or otherwise, in aviation or aeronautics. Where the service, travel and flight in the aircraft had definitely ended, and the only connection the insured had with the plane at the time he met his death by drowning, was that he had arrived by plane at a place near where he was drowned, his death was too remote to be considered the result of participation in aviation or aeronautics. Bull v. Sun Life Assurance Co., supra.

I must, therefore, conclude that the proximate cause of the death of Lieutenant King was accidental drowning, within the terms of the policy;[4] and that his death did not result from participation as a passenger or otherwise in aviation or aeronautics, within the meaning of the exclusion provisions of the policy, and consequently the plaintiff is entitled to recover from the defendant the sum of Five Thousand Dollars ($5,000), with interest at six per cent. (6%), from the 25th day of August, 1943.

Counsel may submit an appropriate order accordingly.

---

[4] It is well settled that an involuntary death by drowning is a death by external, violent and accidental means. Cooley's Briefs on Insurance, 2d Ed., Vol. 6, page 5254; De Van v. Commercial Travelers' Mut. Acc. Ass'n of America, 157 N.Y. 690, 51 N.E. 1090; United States Mut. Acc. Ass'n v. Hubbell, 56 Ohio St. 516, 47 N.E. 544, 40 L.R.A. 453; Anderson v. Inter-State Business Men's Accident Ass'n of Des Moines, Iowa, 354 Ill. 538, 188 N.E. 844; Manufacturers' Accident Indemnity Co. v. Dorgan, supra.