354    APPELLATE COURTS OF ILLINOIS.

Sturm v. Employers' Liability Assur. Corp., Ltd., 212 Ill. App. 354.

## Pauline Sturm, Appellee, v. The Employers' Liability Assurance Corporation, Ltd., Appellant.

## Gen. No. 23,829.

1. INSURANCE—*what constitutes accidental death.* One who comes to his death by drowning suffers death by external, violent and accidental means.

2. INSURANCE, § 601*—*what constitutes prima facie case of accidental death.* Proof that a man, a few minutes after being seen apparently in good health, was found under water, dead, is sufficient to create a prima facie case of accidental death, within the terms of an accident policy.

3. EVIDENCE, § 478*—*when doubtful conclusion arises from inferences upon inferences.* Although inferences from inferences may, under certain circumstances, be admissible, the more remote the inference the more enfeebled its probative value, and doubt as to any one of them renders the conclusion doubtful.

4. INSURANCE, § 686*—*when death by accidental drowning is question for jury.* Evidence that insured was found dead in a bathtub after having been seen in apparent health a few minutes before, coupled with proof of some of the external indicia of death by drowning, *held* to warrant submission to the jury of the question as to whether insured's death was caused by accidental drowning, notwithstanding expert testimony that death was due to disease.

5. INSURANCE, § 231*—*when warranties and representations refer only to original accident policy.* Warranties and representations in connection with an accident policy, issued for annual periods, *held* to refer to the original policy and not to renewals.

6. INSURANCE—*when drowning of diseased person is sole cause of death.* Where insured was found dead in a bathtub, the fact that he may have been diseased and that his abnormal condition may have led to his falling into the tub and being drowned would not prevent a recovery on the policy, since if he came to his death by drowning, legally that was the sole cause of his death.

Appeal from the Circuit Court of Cook county; the Hon. CHARLES M. WALKER, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1917. Affirmed. Opinion filed October 16, 1918. Rehearing denied October 28, 1918. *Certiorari* denied by Supreme Court (making opinion final).

WINSTON, STRAWN & SHAW, for appellant; JOHN D. BLACK, of counsel.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

MOSES, ROSENTHAL & KENNEDY, for appellee; JOSEPH
W. MOSES and WALTER BACHRACH, of counsel

MR. JUSTICE TAYLOR delivered the opinion of the
court.

An accident policy, issued on March 20, 1911, to
Adolph Sturm, provided that, in case of his death by
accident, the amount of the policy should be payable
to Pauline Sturm, the plaintiff, and Adolph Sturm
having since died, the question arises whether his
death was caused in such a way as to make the de-
fendant liable under the policy.   The insured died
on the morning of June 6, 1914, while in a bathroom
which adjoined his bedroom at his home in Chicago;
and the question submitted to the jury for its con-
sideration was whether the death of Adolph Sturm
was caused by drowning.   There were no eyewitnesses
to his death, so that the evidence is entirely circum-
stantial.   The jury brought in a verdict for $8,494.79,
upon which judgment was entered.   This appeal was
taken therefrom.

Adolph Sturm, to whom the accident policy in ques-
tion was issued, was at the time of his death 67 years
and 8 months of age, and apparently in good health.
He was 5 feet 5½ inches tall, and weighed between
150 and 155 pounds.   He was robust, large around the
waist, somewhat corpulent and full-blooded.   With the
exception of two attacks of facial erysipelas, occur-
ring 15 months or more prior to his death and last-
ing a few days, he had no illness between March 20,
1911,. and the time of his death.   He attended to his
business—that of· a clothing manufacturer—every
day, save when he had erysipelas, and was active up
to the day of his death.   He lived with his wife, his
daughter Celia, and his daughter Claudine and her
husband, Milton·Sturm, in a two and one-half story
house at 3933 Pine Grove avenue.   He and his wife
occupied the front bedroom.   Connected with that bed-

room was a private bathroom, in which there was a porcelain tub with ordinary faucets and a drainpipe at the foot. The upper part was rounded and the bottom of the tub was curved. According to the testimony of the daugther Celia, it was so curved that she would never bathe in it. The tub was 5 feet 1½ inches long, between 28 and 29 inches wide, and 16½ to 17 inches deep. One side of the tub was close up against the side of the bathroom, and in the wall on that side, from 4½ to 5 feet above the floor, there was a window. On the ledge of that window the deceased was in the habit of keeping a bottle of bay rum and a small case in which he kept his safety razor. It was, each morning, the habit of the deceased to get into the bathtub, and, while the water was running in, to lather his face and shave himself.

The evening before his death he received a visit from his son Meyer and his wife, and in the course of the evening, after dinner, played cards with his daughter Celia. About 11 o'clock that night Meyer Sturm and his wife went to their home in Wilmette, and shortly afterwards the assured and his wife retired. Although they slept in the same room, they occupied separate beds. The next morning, about 7 o'clock, the assured got up and went into the bathroom and opened the faucet to let the water run in for his bath. He then went out into the hall and got some towels. He then went back and got into the bathtub. The plaintiff got up and dressed and went into the bathroom and spoke to the assured, who at the time was sitting in the tub, with the water still running, lathering his face ready for his shave. At that time the tub was only half full. The plaintiff, after telling him that she would go down and see that his breakfast was all right, left him in the bathtub and went downstairs. After attending to certain household matters downstairs, as well as on the second floor where the bathroom was located, and doing

some telephoning, she went back upstairs into the little back sitting room and began reading the newspaper. After reading several minutes and waiting for her husband to come out of his room, and not hearing any noise, she went forward into her bedroom, but he was not there. As the time taken before coming down to breakfast was more than usual, she went into the front bedroom, and not seeing him there went into the bathroom and found the assured dead in the bathtub. He was entirely under water—which was lukewarm— with his knees up and head "forward on his chin." The water was a foot deep over his head. The plaintiff screamed out his name and then took hold of his body by the shoulders and pulled it out as far as she could. She held on for a few minutes, screaming while she did so. The level of the water was about 2 or 3 inches below the top of the tub, the latter being as full as it could be, being up to the top of the drain. There was about a day's growth of beard on the face of the assured, indicating that death occurred before he began shaving. The safety razor was on the bottom of the tub when the body was first discovered. There was no hair or soap on the blade. The plaintiff's daughter came in and shortly after, her son-in-law. The water was then let out of the tub. There was considerable water on the floor of the bathroom. Milton Sturm came in and poured some whisky between the lips of the assured. Shortly afterwards Dr. Wermuth arrived, and after examining the body of the assured and finding no pulse and no heartbeat, undertook artificial respiration, but with no result, though at the time about a pint of water came from his mouth. The artificial respiration consisted of expansion and contraction of the chest, lifting the arms up and then putting them down. It produced no beneficial result, however, as the body was cold and rigor mortis had already set in. The liquid which came from his mouth was rather dark colored. After Dr. Wermuth left,

Milton went back upstairs into the bathroom, and saw that there was a sort of lather-like sputum running out of the corners of the mouth of the deceased. It was a great deal like saliva would look if it were churned between the teeth. It was viscid and bubbled out of the corners of his mouth. Somewhere between half an ounce and an ounce came out. Shortly afterwards Dr. Kunz called and examined the body and concluded that he was dead and had been for some time. He did not see any marks of violence on any part of the body.

Subsequently, on June 6, 1914, the coroner's physician, Dr. Rheinhardt, made a post-mortem examination. He found no external marks or evidence of violence. When he first saw the body there was no foam on the lips or mouth. The post-mortem examination disclosed to him that there was œdema of the brain, arterio-sclerosis of the arteries of the brain, a frothy liquid which could be easily expressed from the lungs, and the lungs full of fluid mixed with air, and some congestion of blood in the lower part of the lungs, arterio-sclerosis in the arch of the aorta, and no water in the lungs, and no fluid or hemorrhage appearance about the contents of the trachea and bronchial tubes; that the inner lining of the heart was roughened and the valves arterio-sclerosed; that the heart was abnormal in that the muscular construction was degenerated by diseased conditions; that there were fatty changes in the liver; that the kidneys were diseased with chronic interstitial nephritis, and with cystic degeneration. It was his opinion that the assured did not come to his death by drowning. Dr. Fischer, who was present at the post-mortem and took part in the examination, was of the opinion that the deceased did not drown, but died from chronic myocarditis complicated by chronic nephritis. He, however, stated that the lather-like foam would suggest that drowning might have occurred, and further that it would be possible

Sturm v. Employers' Liability Assur. Corp., Ltd., 212 Ill. App. 354.

for a man who had the diseases that the assured suffered from to die of drowning.

Afterwards, on June 18, 1914—the body having been embalmed, buried and then exhumed—an autopsy was held at Rosehill Cemetery, by Drs. Hektoen, Hamill, Moyer, Dagg and Eustis. Dr Hektoen found no evidence of water in the lungs; no evidence of hemorrhage in the lining of the lungs; no froth mixed with blood or otherwise, and was of the opinion that the assured died from heart disease and not from drowning. He stated, however, that froth in the air passages is a very constant sign of drowning, and that it was possible for one having heart disease to die by drowning. Dr. Hamill, who was present at the autopsy at Rosehill and examined part of the organs of the deceased at the Columbus laboratory, said that he found no frothy fluid or water in the bronchial tubes or the trachea; that there was a little frothy fluid in the lower lobe of the right lung; that in his opinion the assured died of myocarditis. Dr. Moyer was of the opinion that the emission of foam from the mouth would be of great importance in determining whether the assured died from drowning; that it would depend somewhat on the kind of foam, the size of the bubbles, and its character. Dr. Dagg was of the opinion that the presence of foam coming from the mouth is a usual sign of death by drowning. Dr. Wermuth, who saw the body on the morning of its death, and undertook to produce artificial respiration, stated that liquid came from the mouth; that it was rather dark colored, like dirty water and grease, and that he came to no conclusion as to the cause of death; that he found no characteristic symptoms of any particular cause which he recognized as a possible cause of death. None of the doctors, Wermuth, Kunz, Moyer and Dagg, who were called as witnesses by the plaintiff, was asked whether he had formed an opinion as to the cause of the assured's death.

At the close of the plaintiff's case, and also at the close of all the evidence, the defendant moved the court for a directed verdict. Both motions were overruled and the cause submitted to the jury. The latter found the defendant guilty and assessed the plaintiff's damages at the sum of $8,494.79, and after a motion for a new trial, and in arrest of judgment, both of which were overruled, judgment was entered upon the verdict in favor of the plaintiff.

The accident insurance policy was issued on April 15, 1911, for one year thereafter. The consideration therefor was $25. By it the defendant insured Adolph Sturm "against the contingencies specified in the schedule of contingencies and benefits, * * * subject to the definitions contained in the schedule of definitions." The "schedule of definitions" provides that the word "injury " shall be defined as "bodily injuries sustained during the term of this policy, solely and independently of all other causes through external, violent and accidental means." The policy provided that the amount set forth in the policy should be payable to the lawful wife (the plaintiff) of said Adolph Sturm. On February 24, 1912, in consideration of $25, the defendant delivered to the latter a renewal receipt, continuing in force the policy of insurance from March 20, 1912, to noon, March 20, 1913, and further renewals were made up to March 20, 1915.

It is the law that one who against his will comes to his death by drowning suffers death by external, violent and accidental means. *Manufacturers' Accident Indemnity Co. v. Dorgan,* 7 C. C. A. 581, 58 Fed. 945.

In the instant case, therefore, the critical question in whether the insured came to his death by involuntary drowning, or from some other cause, such as disease. Where a man, a few minutes after being seen apparently in good health is found under water, dead, and nothing more is known of the cause of death,

the immediate conclusion arrived at is that he was drowned. As the result of common sense and common experience, that opinion is formed by the normal processes of almost instant reason, and it may be said that legally such circumstantial evidence makes out a prima facie case of accidental drowning. *Trew v. Railway Passengers' Assur. Co.*, 6 Hurl. & Norm. 839. Of course, evidence subsequently may be disclosed that conclusively proves the contrary, or, at least, leaves the mind in doubt. Is there such evidence here? As no one saw death take place, the only evidence contradictory of drowning is that of the expert opinions of some of the doctors who physically examined the body of the deceased.

The theory of the doctors called by appellant was that, as there are according to their knowledge and experience certain physical indicia of drowning, some external, such as the exuding from the mouth, shortly after death, of water and a lather-like foam, a strongly corroborating symptom that death took place after the body was submerged; others, internal, discoverable upon a post-mortem examination of the body—such as frothy or bloody material in the bronchial and other air tubes leading into the lungs and certain hemorrhages—and, as they failed to find those indicia, but did find what in their judgment was evidence of certain mortal diseases—arterio-sclerosis, nephritis, myocarditis, and œdema of the brain, or some of them—death came from disease and not from accidental drowning. It was admitted, however, that even though the insured was suffering from all the diseases of which they found evidence, still death could have occurred from drowning. The evidence, however, does show some external indicia of drowning. Milton Sturm testified that when he went back into the bathroom "there was a sort of lather-like sputum running out of the corners of his mouth. * * * It looked a good deal like saliva would look if you sort of

churned it between the teeth. The bubbles were very fine, not exactly slimy. It was viscid. It had some sort of body to it. It bubbled out of the corners of his mouth.''

Dr. Dagg was of the opinion that the foam which came from the mouth and which was otherwise present was evidence of drowning. Dr. Moyer said it depended on what kind of foam it was, the size of the bubbles, its character, and that a certain kind of foam might suggest drowning. Dr. Fischer was of the opinion that the lather-like foam would suggest that drowning might have occurred. Dr. Hektoen said that he found no evidence of water in the lungs—one of the characteristics of drowning—no froth mixed with blood or otherwise in the bronchial tubes or the trachea, no evidence of hemorrhage about the aorta—characteristics of drowning—and yet he admits that ecchymosis is not present in every case of drowning, and that one of the most constant signs of drowning is froth in the air passages and that, although he found none on June 18, 1914, when he made his examination, osmosis may have taken place, that is, the frothy substance might have gone out of the air passages into body tissues. As to the internal evidence, it was the general opinion of the experts that there was none.

Just what took place which caused the assured to go under water, whether it was his will—though, of course, the presumption is against suicide—or whether it was without design, as, e. g., a syncope, cannot now with absolute certainty be known. One of the diseases from which he suffered, according to the opinion of the experts, may have caused him to become unconscious and then to slip or fall in and drown. Then, too, assuming the latter to have taken place, it may be that the internal evidence of drowning where one is unconscious, when he falls in, is slightly different from the case where one is conscious at the time.

Many doubts arise as to the trustworthiness and scientific value of the experts' opinions in the present case, and especially is that true when we realize that they involve, first, an assumption that there are certain symptoms which are a constant characteristic of drowning; second, that an examination of the body by three of them, after it had been embalmed, buried and exhumed, disclosed none of the characteristic symptoms of drowning; third, it did disclose certain mortal diseases; fourth, a conclusion that death was caused by disease.

If any one or more of those inferences is doubtful, the ultimate is doubtful. Of course, an inference from an inference, and then a third and fourth may, under certain circumstances, be admissible *(Ohio Building Safety Vault Co. v. Industrial Board,* 277 Ill. 96 [14 N. C. C. A. 224]), but the more remote the inference the more enfeebled its probative force. Considering the prima facie case made out by the practically undisputed objective circumstances of the assured's death, qualified as it may be by the opinions of the experts, it was entirely proper that it should be submitted to the jury; and, as we are of the opinion that there was ample evidence of accidental drowning, the judgment must stand.

The claim of the appellant that the general demurrer of appellee to the second additional plea was improperly sustained is untenable. A reasonable interpretation of the policy and certificates leads to the conclusion that the representations or warranties had reference only to the time when the original policy was issued. *Fidelity & Casualty Co. v. Meyer,* 106 Ark. 91, 152 S. W. 995.

The appellant claims, further, that it was error to refuse certain proffered instructions. We have examined them and concluded that they were properly excluded. Those, in which it was stated to be the law that if disease contributed to the death of the insured the

plaintiff could not recover, were improper. In view of the facts in this case, such instructions were inapt. Even though the insured were diseased and his abnormal condition led to his falling into the water and being drowned—and so in a sense contributed to his death—it is not the law that that contribution of disease to his death would prevent the plaintiff from recovering. The law distinguishes between so-called successive causes as between successive physical conditions; and the proximate excludes the more remote. If the deceased came to his death by drowning then, legally, that was the sole cause of his death. *Bohaker v. Travelers' Ins. Co.,* 215 Mass. 32; *Manufacturers' Accident Indemnity Co. v. Dorgan,* 7 C. C. A. 581, 58 Fed. 945; *Lawrence v. Accidental Ins. Co.,* L. R. 7 Q. B. Div. 216; *Winspear v. Accident Ins. Co.,* L. R. 6 Q. B. Div. 42.

The contentions as to certain rulings upon the evidence we have considered and find untenable.

Finding no error in the record the judgment is affirmed.

*Affirmed.*