Lena Rogers, Administratrix of the Estate of Leonard Ingstrom, Appellee, v. Prudential Insurance Company of America, Appellant.

Gen. No. 36,270.

Opinion filed May 23, 1933.

HOYNE, O'CONNOR & RUBINKAM, for appellant.

DAVID S. CHESROW and SAMUEL L. GOLAN, for appellee; SAMUEL L. GOLAN, of counsel.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

On February 4, 1932, Lena Rogers commenced a first class action in assumpsit against defendant, based upon its insurance policy insuring the life of Leonard Ingstrom and providing for a double indemnity in case of his accidental death. She commenced the action in her own name on the theory that Ingstrom, having

during his lifetime delivered a certain writing to defendant, had made her the beneficiary of the policy subject to its terms and conditions. On June 30, 1932, however, the court gave her "leave to amend by changing plaintiff from Lena Rogers to Lena Rogers, administratrix of the estate of Leonard Ingstrom," and by further leave she, on July 8, 1932, filed an amended statement of claim, to which defendant filed an affidavit of merits. On July 18, 1932, after a trial without a jury, at which oral and documentary evidence was introduced by each party, the court found the issues against defendant, assessed plaintiff's damages at $2,856, and entered judgment in that sum against defendant. The present appeal followed.

In plaintiff's amended statement of claim (to which is attached and made a part a copy of the policy) she alleged that on July 20, 1931, defendant, in consideration of the payment of a weekly premium of 85 cents by the insured, issued to Leonard Ingstrom its policy of insurance No. 87074961, dated July 20, 1931, insuring the life of Ingstrom in the amount of $1,428; that by one of the provisions of the policy as to "Accidental Death Benefit" it is provided (italics ours):

"Upon receipt of due proof that the Insured after attainment of age 15 and prior to the attainment of age 70, has sustained bodily injury, *solely through external, violent and accidental means,* occurring after the date of this Policy and resulting in the death of the insured within ninety days from the date of such bodily injury while this Policy is in force, and while there is no default in the payment of premiums, the Company will pay *in addition* to any other sums due under this Policy and subject to the provisions of this Policy an Accidental Death Benefit *equal to the face amount of insurance stated in this Policy* less the amount of any disability benefit which has become payable under this Policy on account of the same bodily injury, except as provided below."

That subsequent to the issuance of the policy and while it was in full force and effect—all premiums having been paid—to wit, "sometime subsequent to August 22, 1931, and prior to September 2, 1931," Ingstrom came to his death, "as a result of bodily injury solely through external, violent and accidental means" within 90 days from the date of the bodily injury; that at the time of such violent and accidental death Ingstrom was approximately 27 years of age; that plaintiff has been appointed administratrix of his estate and all moneys due under the policy are payable to her as such administratrix; that the total amount due is $2,856; and that defendant, although often requested, has refused to pay such amount to her or any part thereof, wherefore she brings suit, etc.

On the first page of the policy, in addition to the date and number as above mentioned, are the following paragraphs among others (italics ours):

"The Prudential Insurance Company of America, in consideration of the payment of the weekly premium herein specified, on or before each and every Monday during the continuance of this Policy or until the anniversary date of the Policy immediately preceding the seventieth anniversary of the birth of the Insured, will pay at its Home Office, Newark, New Jersey, immediately upon receipt of due proof of the death of the Insured during the continuance of this policy, the amount of insurance herein specified, *to the executors or administrators of the Insured,* unless payment be made under the provisions of the next succeeding paragraph; subject to the 'General Provisions' on the second page hereof, which are hereby made part of this contract.

"Schedule

| "Name of Insured | Age next Birthday | Amount of Insurance | Weekly Premium |
|---|---|---|---|
| "Leonard Ingstrom | 27 | $1428 | 85 cts." |

Among the "General Provisions" on the second page of the policy are provisions as to "Accidental Death Benefit" (as above quoted in plaintiff's declaration), but immediately under the quoted provisions are mentioned "Exceptions," as follows:

"EXCEPTIONS. (1) If the bodily injuries referred to above shall be sustained by the Insured while engaged in employment in or on the premises of any open pit or underground mine, or shall be sustained by the Insured while on or about the premises or right of way of any railroad company while the Insured is following the occupation of gang, track or roadway laborer; track walker; yard, freight or mixed train brakeman or flagman, the additional Accidental Death Benefit referred to in the first paragraph hereof shall be one-half of the face amount of insurance stated in this Policy, less the amount of any disability benefit which has become payable under this Policy on account of the same bodily injury. (2) No Accidental Death Benefit will be paid if the death of the Insured resulted from *suicide* or from having been engaged in submarine or diving operations, or in aviation as a passenger or otherwise, or from military or naval service in time of war."

In defendant's affidavit of merits to plaintiff's amended statement of claim its defenses are stated to be (a) that "the insurance sued upon in this suit was a speculative adventure by the parties in interest in said litigation, and, therefore, said insurance is void and of no force and effect, and defendant hereby tenders the return of the premiums paid in full satisfaction of all claims against defendant"; (b) that "the alleged insured's death was *not* the result of external, violent and accidental means as alleged"; (c) that defendant "has no knowledge as to when, where and how the alleged insured met his death and of this it demands strict proof"; and (d) "no proofs of death

have been supplied to the Company as required by the policy." As to defense "(a)," no evidence was introduced by defendant to substantiate it and it may be disregarded.

Defendant's main contention here is, in substance, that the judgment should be reversed because plaintiff's evidence did not sufficiently disclose that Ingstrom's death was caused "solely through external, violent *and accidental* means." To maintain her case plaintiff testified in her own behalf and she called as witnesses Doctor Paul A. Isherwood (coroner of DuPage county, Illinois, and a physician and surgeon); Theodore Schwer (a partner in business with Ingstrom prior to August 22, 1931); Allen A. Myers (an investigator employed in the office of the State's attorney and the coroner of DuPage county); Jerry C. Miller (a friend of Ingstrom for several years); and Francis K. Wilton and William McDonald, agents of defendant in Chicago or vicinity. From the testimony of these witnesses the following facts appeared: On and prior to August 22, 1931, Ingstrom, a bachelor about 27 years of age, was a partner of Schwer in a small business. He was then and had been for several years a roomer in a rooming house, managed by Lena Rogers, at 219 South Throop street, Chicago. On Saturday evening, August 22, 1931, in apparent good health, he left his residence but did not return that evening or on Sunday. On Monday morning Lena Rogers, becoming alarmed over his continued absence, notified the Chicago police and the State's attorney's office and a search for him was made. On September 2, 1931, the body of a deceased man was found lying in an open field alongside a graveled road or street, just inside the fence, in DuPage county, and Lena Rogers and Schwer were notified.

Doctor Isherwood, the coroner, testified on direct examination that on that day he with other persons went to the place; that they found "the body fully

clothed—*both hands being tied behind the back with a necktie";* that "the wrists were crossed and tied together with a double knot at his back"; that the deceased "could not have tied his own hands behind his back"; that the body was "removed to the undertaking establishment of Ruchty Brothers in Hinsdale, Illinois"; that the deceased was "about 5 feet, 6 or 7 inches, in height, and would weigh about 130 or 140 pounds"; that "I searched his clothing and found numerous papers and cards, and he wore a leather belt with a white metal buckle with the initials 'L. I.' on it"; that later in the day Theodore Schwer came to Hinsdale and "examined the clothing and effects on the body, and the belt, buckle and other things, which were shown to Schwer, were all found on the body of the man"; that based upon the witness' experience as coroner for about seven years and as a physician for about 20 years, he had an opinion as to how the man came to his death, and as to how long he had been dead, and that in the witness' opinion he came to his death "presumably *by violence*," and that he had been dead "about a week or more." On cross-examination Dr. Isherwood testified that he found the body "in an extreme state of putrefaction"; that the man's clothes "were quite odoriferous," and "everything was soaked into the clothes"; that it was quite hot in August and September, 1931.

Theodore Schwer testified that on September 2, 1931, after receiving notice, he went to Hinsdale, met the coroner (Isherwood), and the State's attorney's investigator (Myers), visited the undertaker's (Ruchty) place and saw the body "in a box"; that he also saw "a suit of clothes" of the man; that he recognized the suit as the one that "Ingstrom had been wearing for the last year or so"; that he also saw a straw hat and a leather belt, with the initials "L. I." on it, both of which he recognized as being Ingstrom's; that he also saw certain papers, including some of their part-

nership "literature"; that he also found a "pocket-book or leather fold" which belonged to Ingstrom, and also a "bank book on the Mid-City Bank," which he did not recognize but which had the name "Leonard Ingstrom" on it; and that Ingstrom was "about 5 feet, 7 inches, tall," and in August, 1931, weighed about 135 pounds.

Allen A. Myers testified in substance that on September 2, 1931, in company with the coroner and State's attorney, and also a deputy sheriff, of DuPage county, he saw the body of the man lying alongside 79th street in DuPage county; that he was about 5 feet and seven and one-half to eight inches in height; was rather slight, and weighed, probably, 135 to 140 pounds; that he could not tell his age "as the body was in such shape"; that the man was fully clothed and was "lying on his face *with his hands tied in back of him with a necktie"*; that from cards in the man's clothing he learned about his business connection with Schwer and caused Schwer to be notified; that after the body had been taken to the undertaker's, Schwer came and he there was shown the body, the clothing, the cards and papers, and the belt buckle with the initials "L. I." on it; that these cards and papers were found in an inside coat pocket; that the body at the undertaker's was "in very bad condition, maggots, in terrible shape"; and that "the features and face were badly decomposed and could not be recognized."

Jerry C. Miller, a friend of Ingstrom for several years, and who saw him frequently, testified that Ingstrom was not over 5 feet, seven and one-half inches, tall, and was not "five foot ten" as claimed by defendant.

Plaintiff's evidence as above outlined was not contradicted by any of defendant's evidence, except as to the height and weight of Ingstrom. It appeared from the written application (introduced by defendant and dated July 16, 1931) for the insurance in question, that

the answer as to "height and weight" is filled in as "5 ft. 10 in. 152 lbs."; but it also appears from the testimony of defendant's agent, McDonald, that he (McDonald) wrote in the particular answers from what he understood Ingstrom to say in reply to the questions, and that he (McDonald), while he noticed Ingstrom was shorter than he was, "didn't make any particular point of his height." We are of the opinion that it clearly appears from all the evidence that the body which was found in said field on September 2, 1931, and which before burial was taken to said undertaker's place in Hinsdale, was that of the insured, Ingstrom. And considering the evidence, as well as the authorities hereinafter mentioned, we are further of the opinion that it sufficiently appears that Ingstrom's death was caused "solely through external, violent *and accidental* means."

The word "accidental" is defined in the Century Dictionary as "happening by chance or accident or unexpectedly; taking place not according to the usual course of things; casual, fortuitous; unintentional." In 1 Bouvier's Law Dictionary (Rawle's 3rd Revision) p. 101, the word "accident" is defined as "an event which, under the circumstances, is unusual or unexpected; an event the real cause of which cannot be traced, or is at least not apparent." In 1 C. J., sec. 72, pp. 425, 426, in the article on "Accident Insurance" it is said:

"The terms 'accident' and 'accidental,' as used in insurance policies covering accidental death . . . , are presumed to be employed in their ordinary and popular sense, as meaning happening by chance; . . . not according to the usual course of things; . . . an event which takes place without the foresight or expectation of the person acted upon or affected by the event; . . . if happening through human agency, an event which, under the circumstances, is unusual and not expected to the person to whom it happens; . . . "

In 2 Bouvier's Law Dictionary, p. 1625, it is said:

"Accident insurance is intended to furnish indemnity against accidents and death caused by accidental means, and the language of the policy must be construed with reference to that proposition. In case of doubt the construction should be liberal in favor of the insured." (Citing *Healey v. Mutual Accident Ass'n*, 133 Ill. 556, 561.)

In 1 C. J., sec. 77, p. 431, under the heading "Intentional Injuries Inflicted by Third Persons," it is said: "Injuries inflicted by a third person without fault of insured have been held within accident policies." (Citing numerous cases in a note.)

In 1 C. J., sec. 78, pp. 432, 433, under the heading "External, Violent and Accidental Means," it is said: "It is a very usual provision of an accident policy that it shall apply only to death or injury through 'external, violent, and accidental means,' in which case the policy embraces only cases where the elements of force and accident concur in effecting an injury. But if the cause of the injury or death can be shown to be due to accidental or unnatural means this imports that such injury or death is due to external and violent means, and the nature and character of the injury may also be sufficient to establish that it was inflicted by external and violent means. . . . The word 'external' in such a clause refers to the means which cause the injury, and not to the injury itself, . . ."

In 1 C. J., sec. 278, p. 495, under the heading "Presumptions as to Cause of Death or Injury," it is said: "Where, however, it is apparent that the injury to or death of the insured was the result of external and violent means, and the issue is as to whether it was due to an accident, within the meaning of the policy, or to some cause *excepted* by the policy, *the presumption is in favor of accident* and against the existence of facts bringing the case within any of the exceptions of the policy, such as insanity of the insured, inten-

tional injury inflicted by a third person, lack of due care and diligence, self-inflicted injuries, and suicide. These presumptions may, however, be overcome by facts and circumstances establishing the contrary."

In the policy sued upon in the present case, the "exceptions" are above set out in full. While it there appears that death by suicide prevents the payment of any "Accidental Death Benefit," there is no exception if the death be caused by injuries intentionally inflicted by some person *other than the insured,* as was the case in *Travelers' Ins. Co. v. McConkey,* 127 U. S. 661, and numerous similar cases. Nor does it appear from the evidence in the present case that any of the "exceptions" in the policy were relied upon as a defense. And there was no evidence even tending to show that Ingstrom had committed suicide. Indeed, there was strong evidence to the contrary. While the burden of proof was upon the plaintiff to show that Ingstrom's injuries were accidental and not self-inflicted, it was not necessary for plaintiff to show by an *eyewitness* that the injuries which caused the death were accidental. That fact could be and was sufficiently established by *circumstantial* evidence. (See *Wilkinson v. Aetna Life Ins. Co.,* 240 Ill. 205, 211.) And where a plaintiff makes out a prima facie case of death of the insured from external, violent and accidental means, the burden is then upon the defendant to show that said death resulted from a cause excepted in the policy. (*Nalty v. Federal Casualty Co.,* 245 Ill. App. 180, 185; 14 R. C. L. p. 1437, sec. 599.)

The following adjudicated cases in other jurisdictions may be cited as supporting plaintiff's contention that Ingstrom's death was caused "solely through external, violent and accidental means" and as also supporting the finding and judgment of the trial court for the full amount of plaintiff's claim: *Fidelity & Casualty Co. v. Johnson,* 72 Miss. 333, 336, 337; *Travelers' Ins. Co. v. Wyness,* 107 Ga. 584, 589, 590; *Gaynor v.*

*Travelers' Ins. Co.* (Ga. App.), 77 S. E. 1072, 1073; *Hutchcraft's Ex'r v. Travelers' Ins. Co.*, 87 Ky. 300, 303; *Lovelace v. Travelers' Protective Ass'n*, 126 Mo. 104, 116, 117; *Collins v. Fidelity & Casualty Co.*, 63 Mo. App. 253, 256, 257; *Richards v. Travelers' Ins. Co.*, 89 Cal. 170, 175, 176; *Phoenix Accident & Sick Benefit Ass'n v. Stiver*, 42 Ind. App. 636, 639, 640; *Robinson v. United States Mut. Acc. Ass'n*, 68 Fed. 825, 826, 827.

Defendant's counsel also contend that the judgment should be reversed because no "proper" proofs of Ingstrom's death were made to defendant. It is not urged that the proofs were not promptly made, but it is argued (1) that such proofs should have been made in plaintiff's name as *administratrix* instead of in her *individual* name at a time when she believed she was the beneficiary, and (2) that the proofs did not sufficiently show a claim for the "accidental death benefit." We do not think there is any substantial merit in the contention or argument, especially as the evidence discloses that about two days after Ingstrom's body was found, agents of defendant were advised of the facts and the "claimant's certificate," on a form furnished by defendant and dated September 4, 1931, was filled out by one of its agents and signed by plaintiff as directed, and that in the certificate, in answer to certain questions, it is stated that the insured met an "accidental death," and that he did not die at home or in a hospital but "was found in a ditch."

Our conclusion is that the judgment of the municipal court should be affirmed, and it is so ordered.

*Affirmed.*

SCANLAN, P. J., and SULLIVAN, J., concur.