Mattie Dietz, Appellee, v. Metropolitan Life Insurance Company, Appellant.

Gen. No. 40,453.

Heard in the second division of this court for the first district at the October term, 1938. Opinion filed May 28, 1940.

HOYNE, O'CONNOR & RUBINKAM, of Chicago, for appellant; NATHANIEL RUBINKAM and WILLIAM S. ALLEN, of Chicago, of counsel.

HERBERT G. IMMENHAUSEN and SAMUEL W. BANOVITZ, both of Chicago, for appellee; MEYER C. BALIN, of Chicago, of counsel.

MR. PRESIDING JUSTICE JOHN J. SULLIVAN delivered the opinion of the court.

This is an action under the double indemnity provisions of a life insurance policy in the sum of $1,000, issued by defendant on the life of Dorothy Dietz, in

which plaintiff, her mother, is named beneficiary. Judgment for $1,000 was entered against defendant upon the verdict of the jury. This appeal followed.

Plaintiff's complaint alleged the issuance of the policy and that on December 26, 1936, Dorothy Dietz, the assured, died ''as a result, directly and independently of all other causes of bodily injuries sustained through external, violent and accidental means, and that said death did not result under any of the exceptions'' set forth in the policy; that due proof of death was made; and that defendant paid the death claim of $1,000 but refused to pay the additional $1,000 due under the double indemnity provisions of the policy. It was alleged in the second count of the complaint that the assured was accidentally drowned.

Defendant's answer admits the issuance of the policy and the payment of the face amount of same. It denies that the assured came to her death as a result, directly and independently of all other causes of bodily injuries sustained through external, violent and accidental means, and alleges that her death was caused by or contributed to directly or indirectly, or wholly or partly, by disease or bodily or mental infirmity; and that for a period of two years prior to her death Dorothy Dietz ''had been subject to dizzy and fainting spells and epileptic fits, which were caused by brain anemia.''

Dorothy Dietz, the assured, was 22 years old at the time of her death on December 26, 1936. She had been working that day until 1 p.m. and after spending the afternoon shopping with her mother reached home about 6 o'clock that evening. About 7 p.m. Dorothy went into the bathroom of her home and ran the water to take a bath. As her mother was going out about 10 minutes later she called to Dorothy through the closed door of the bathroom and upon receiving no response, knocked at said door. She then called her husband, who forced the door open, and they found Dorothy sitting in the bathtub nude and slumped forward with her

mouth and nose under the water. The bathtub was "half or over half full" of water and the bathroom was very warm. She was taken from the bathtub and laid on the bedroom floor, where she was given first aid. Her face was rather blue and "water came out of her mouth . . . about a cupful, half a cup." A neighbor who was called in turned her over on her face. He was familiar with and used the prone pressure method on her and "water ran out—," which was mopped up. Then "water oozed out of her nose," which was also mopped up. This neighbor worked on her 8 or 10 minutes until the pulmotor squad arrived. The pulmotor was used on her for about 25 minutes and during that time no water came from her nose or mouth. In his report the lieutenant in charge of the pulmotor squad stated that death was "due to a fainting spell and drowning in the bathtub." The attempt of the pulmotor squad to revive the assured was without success and she was pronounced dead by a physician upon his arrival. The body was taken to an undertaking establishment, where an inquest was held. There was no autopsy. The verdict of the coroner's jury was that Dorothy Dietz came to her death "in the bathroom of her home located at 1768 Leland Avenue, due to asphyxiation by drowning, said decedent was suffering from epilepsy fits and was seized with said illness while taking a bath at above mentioned location on December 26, A. D. 1936. We the jury believe said occurrence to be an accident." Dr. Jacob Goodman, coroner's physician, testified that he found no cause of death other than drowning. Dr. Christopher S. O'Neill stated in answer to a hypothetical question, "I would conclude that the girl died of drowning." Police officer Charles J. McCarthy, who arrived at the Dietz home to make an investigation of the assured's death, after the pulmotor squad had left, testified that while plaintiff, Mattie Dietz, was in the same room "in a pretty hysterical condition . . . she was crying and sobbing" and talking to other people, Mr. Dietz made

a statement to him. He stated that Dorothy's father "told me she was a girl subject to fainting spells and dizzy spells . . . she was under the care of Dr. O'Neill for about a year and a half for this same trouble but that he thought she—was getting better for she didn't get those spells as often as she did when they first started . . . he said epileptic or dizzy spells . . . about six months previous to this time she had one of those spells . . . of course they happened at home at the time and they got to her right away." By stipulation the signed statement of Officer McCarthy's testimony before the coroner's jury was received in evidence. Such statement discloses that McCarthy testified before said jury that the assured's father merely told him that "she was under a doctor's care for about 1½ years and was subject to fainting spells." McCarthy did not tell the coroner's jury that Mr. Dietz ever stated to him that Dorothy suffered from epileptic spells.

Dr. Robert A. Lamb testified as an expert witness for defendant. He was asked a hypothetical question which assumed substantially all the facts and circumstances in evidence. The following questions were then asked him and he made the answers indicated: "Mr. Welsh: Q. Well, have you an opinion . . . whether or not the condition she was treated for the two years, together with the fact that she had had epileptic fits, do you think that contributed to her death. A. Absolutely. Q. Now, doctor, the condition which this hypothetical girl was treated for, anemia, low blood pressure and nervousness, is that any indication that she might have fainting spells or fits? A. Yes, it is."

He further testified that anemia is not a disease but a condition; that low blood pressure is not a disease; that nervousness is also a condition; that nervous people faint, and that a person without epilepsy can faint; that if the head of an unconscious person is immersed in water, such person can "take sufficient water to drown"; that drowning is asphyxiation—a lack of supply of air

to the respiratory system; that any amount of water that gets into the throat and obstructs the breathing will cause asphyxiation, particularly if the person is unconscious; and that perfectly normal and healthy persons have been known to drown upon entering a tub half full of water.

Defendant contends that "plaintiff failed to meet the burden of proof that death was the result of drowning or that death was the result, directly and independently of all other causes, of bodily injuries sustained through external, violent and accidental means"; that "the death was caused by or contributed to by disease and under the terms of the policy there is no liability for double indemnity in such event"; and that "since the plaintiff failed to establish a prima facie case, that the motion of the defendant for a directed verdict should have been allowed."

Plaintiff's theory as stated in her brief is that "the assured came to her death by asphyxiation through drowning; that her death was the result, directly and independently of all other causes, of bodily injuries sustained through external, violent and accidental means."

The principal question presented is whether plaintiff established prima facie that the death of the assured was caused by drowning. There were no eyewitnesses to her death so that the evidence is entirely circumstantial. It is the law that one who against his will comes to his death by drowning, suffers death by external, violent and accidental means. (*Manufacturer's Acc. Indem. Co. v. Dorgan,* 7 C. C. A. 581, 58 Fed. 945.) In *Sturm v. Employers' Liability Assur. Corp., Ltd.,* 212 Ill. App. 354 (certiorari denied) the facts are practically identical with the facts here. In that case the evidence showed that assured died in the bathtub of his home in Chicago, and the issue of fact was whether his death was from accidental drowning or disease. There were no eyewitnesses. The evidence as to the manner of his death was wholly circumstantial. The assured was

past 67 years of age, somewhat corpulent and full-blooded. In the 15 months prior to his death he had suffered from two attacks of facial erysipelas but from no other illness. The morning of his death assured went to the bathroom, turned on the water, went out to the hall and got some towels; he then got into the bathtub. His wife went to the bathroom, saw him sitting in the tub, which was half full of water; while the water ran he lathered his face preparatory to shaving; she left, telling him she would get breakfast, which she then prepared, and assured not appearing as soon as expected, she went into the bathroom where she found him dead, the tub being full of water; the body was entirely under water, the knees up and the head leaned forward on his chin; the water was a foot deep over his head; the face was unshaven; the safety razor was at the bottom of the bathtub; there was no hair or soap on the blade. A doctor summoned tried artificial respiration without result; a dark colored liquid came from the mouth and a latherlike sputum from the corners of the mouth. A post mortem disclosed arteriosclerosis of the brain, in the arch of the aorta and of the valve of the heart; there were fatty changes in the liver, the kidneys were diseased with chronic interstitial nephritis, and with cystic degeneration. There was medical opinion to the effect that deceased did not come to his death by drowning and that the cause of death was chronic myocarditis complicated by chronic nephritis. There was also some medical evidence tending to show that the death was by drowning. There the court said at pp. 360–364:

''In the instant case, therefore, the critical question in [is] whether the insured came to his death by involuntary drowning, or from some other cause, such as disease. Where a man, a few minutes after being seen apparently in good health is found under water, dead, and nothing more is known of the cause of death, the immediate conclusion arrived at is that he was drowned.

As the result of common sense and common experience, that opinion is formed by the normal processes of almost instant reason, and it may be said that legally such circumstantial evidence makes out a prima facie case of accidental drowning. *Trew v. Railway Passengers' Assur. Co.*, 6 Hurl. & Norm. 839. Of course, evidence subsequently may be disclosed that conclusively proves the contrary, or, at least, leaves the mind in doubt. Is there such evidence here? As no one saw death take place, the only evidence contradictory of drowning is that of the expert opinions of some of the doctors who physically examined the body of the deceased.

" . . .

"Just what took place which caused the assured to go under water, whether it was his will—though, of course, the presumption is against suicide—or whether it was without design, as, e.g., a syncope, cannot now with absolute certainty be known. One of the diseases from which he suffered, according to the opinion of the experts, may have caused him to become unconscious and then to slip or fall in and drown. Then, too, assuming the latter to have taken place, it may be that the internal evidence of drowning where one is unconscious, when he falls in, is slightly different from the case where one is conscious at the time. Many doubts arise as to the trustworthiness and scientific value of the experts' opinions in the present case, and especially is that true when we realize that they involve, first, an assumption that there are certain symptoms which are a constant characteristic of drowning; second, that an examination of the body by three of them, after it had been embalmed, buried, exhumed, disclosed none of the characteristic symptoms of drowning; third, it did disclose certain mortal diseases; fourth, a conclusion that death was caused by disease.

"If any one or more of those inferences is doubtful, the ultimate is doubtful. Of course, an inference from

an inference, and then a third and fourth may, under certain circumstances, be admissible (*Ohio Building Safety Vault Co. v. Industrial Board,* 277 Ill. 96 [14 N. C. C. A. 224]), but the more remote the inference the more enfeebled its probative force. Considering the prima facie case made out by the practically undisputed objective circumstances of the assured's death, qualified as it may be by the opinions of the experts, it was entirely proper that it should be submitted to the jury; and, as we are of the opinion that there was ample evidence of accidental drowning, the judgment must stand.

"...

"...Even though the insured were diseased and his abnormal condition led to his falling into the water and being drowned—and so in a sense contributed to his death—it is not the law that that contribution of disease to his death would prevent the plaintiff from recovering. The law distinguishes between so-called successive causes as between successive physical conditions; and the proximate excludes the more remote. If the deceased came to his death by drowning then, legally, that was the sole cause of his death. *Bohaker v. Travelers' Ins. Co.,* 215 Mass. 32; *Manufacturers' Accident Indemnity Co. v. Dorgan,* 7 C. C. A. 581, 58 Fed. 945; *Lawrence v. Accidental Ins. Co.,* L. R. 7 Q. B. Div. 216; *Winspear v. Accident Ins. Co.,* L. R. 6 Q.B. Div. 42."

Considering the prima facie case made out here by the practically undisputed circumstances of the assured's death, it was properly submitted to the jury. And where a plaintiff makes out a prima facie case of death of the insured from external, violent and accidental means, the burden is then upon defendant to show that said death resulted from a cause excepted in the policy. (*Rogers v. Prudential Ins. Co.,* 270 Ill. App. 515; *Nalty v. Federal Casualty Co.,* 245 Ill. App. 180, 185; 14 R. C. L., p. 1437, sec. 599.)

There is no evidence in the record that the assured suffered from any mental infirmity. Her mother

testified that Dorothy had no physical infirmities, that during her infancy and early childhood she had whooping cough, chicken pox and measles and that in 1936 Dr. O'Neill said that she was anemic and nervous and had low blood pressure. Dr. O'Neill, who had been treating the assured intermittently since 1934, testified that he examined her in September, 1936, approximately four months prior to her death, and found that she was normal and not suffering from any disease at that time and that "she was apparently in good health." The employer of the assured stated that she had worked until 1 p.m. on the day of her death and that she had not been absent from her work a single day during the almost two years of her employment.

It will be noted from the evidence heretofore set forth that not a single witness who testified in defendant's behalf had any direct knowledge that the assured suffered from any disease or physical impairment at any time prior to her death. The jury apparently deemed the evidence presented by defendant bearing upon the possible diseased condition of the assured to be of insufficient probative force to show that her death was "caused by or contributed to, directly or indirectly, or wholly or partly, by disease or by bodily or mental infirmity."

Defendant urges that the receipt of proof that death was solely the result of accidental means is a condition precedent to liability and insists that since the proof of death filed by plaintiff with the defendant company contains as a part thereof "the coroner's verdict, which in itself shows that the death was caused by or contributed to by epilepsy, which is a disease" there can be no recovery.

Plaintiff testified that she was not present at the coroner's inquest and that she neither procured the copy of the coroner's verdict, which was attached to the proof of death, nor did she attach same thereto. In any event, since the assured met with a sudden death,

it was necessary that the coroner's verdict accompany the proof of death and, even if plaintiff had furnished same, the recitals and findings therein concerning the cause of death of the assured were not conclusive upon her.

In *Wachtel v. Equitable Life Assur. Society,* 266 N. Y. 345, cited by defendant, it was held that an admission in a proof of death is binding unless and until it is corrected or explained. In *Ferrero v. National Council Knights & Ladies of Security,* 309 Ill. 476, the court held in an action on a benefit certificate that a statement in the proof of death that the assured died by his own hand was admissible but not conclusive as to the manner of death. In *Modern Woodmen of America v. Davis,* 184 Ill. 236, suit was brought upon a policy which provided that it should become void if the assured may "become so far intemperate . . . as to permanently impair his health so to produce delirium tremens." Defendant filed a special plea alleging that the notice and proofs of death of the assured forwarded to the order by the plaintiff stated that the assured had died from acute alcoholism, and that, therefore, there could be no recovery. In discussing the defense offered by the special plea the court said at pp. 237, 238:

". . . Any statement contained in the notice and proofs of death was available to the order as evidence in the nature of admissions made by the plaintiff in the action, but we find nothing in the averments of the plea upon which to base the contention an estoppel arose. That the statement in the proof of loss was made with the intention the order would act upon it, and that the order did act upon it and changed its position to its injury, was at least essential to the creation of an estoppel. But the pleas contained no such averments. The admission referred to in the plea was found in the affidavit of the physician who attended the assured during his last illness. This affidavit was filed in obedience to a rule of the order. Proofs of death, if in compliance

with the requirements of the order, form a legal basis for an action on a certificate issued by the order, even though the proof contain matter damaging to the case of the beneficiary. (13 Am. & Eng. Ency. of Law 65.) The real cause of death remained a question of fact, in the elucidation whereof the beneficiary was not restricted to the testimony of the physician. Her right to recover could not be conclusively determined from the affidavit of the physician filed by her, because the rule of the order required it to be filed. Nor was she estopped to combat the truth of the affidavit of the physician. (*Bent v. Northwestern Aid Ass'n,* 41 N. W. Rep. 1037.) "

The finding contained in the coroner's verdict that "said decedent was suffering from epileptic fits and was seized by said illness while taking a bath" is not in accord with any competent evidence contained in the record and it has been effectually combatted by the prima facie case made by plaintiff that the assured was accidentally drowned.

In our opinion there was ample evidence to justify the verdict in favor of plaintiff and the judgment entered thereon should stand.

For the reasons stated herein the judgment of the circuit court is affirmed.

*Judgment affirmed.*

Friend and Scanlan, JJ., concur.